## 22-13293

# United States Court of Appeals
*for the*
# Eleventh Circuit

JOHN DOE,

*Plaintiff/Appellant,*

– v. –

EMORY UNIVERSITY,

*Defendant/Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
CASE NO: 1:21-cv-02763-MHC
(Hon. Mark Howard Cohen)

## APPELLANT'S INITIAL BRIEF

ADRIENNE LEVY
NESENOFF & MILTONBERG, LLP
363 7th Avenue, 5th Floor
New York, New York 10001
(212) 736-4500

ANDREW Y. COFFMAN
PARKS CHESIN & WALBERT, PC
75 14th Street NE, 26th Floor
Atlanta, Georgia 30309
(404) 873-8000

*Counsel for Plaintiff/Appellant*

CP COUNSEL PRESS • VA – (804) 648-3664

**No. 22-13293**
**John Doe v. Emory University**

### CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1(a), the following is a complete, alphabetical list of all persons and entities known to have an interest in the outcome of this appeal:

- Bernstein, Stuart, *Counsel for John Doe*

- Bosin, Joshua I., *Counsel for John Doe*

- Coffman, Andrew Y., *Counsel for John Doe*

- Cohen, Hon. Mark H., *District Court Judge*

- Doe, John, *Plaintiff-Appellant*

- Emory University, *Defendant-Appellee*

- Gansert, MacKenzie Elizabeth, *Counsel for Emory University*

- Hamrick, John M., *Counsel for Emory University*

- Holland & Knight LLP, *Counsel for Emory University*

- Levy, Adrienne, *Counsel for John Doe*

- Lewis, Nicholas E., *Prior counsel for John Doe*

- Miltenberg, Andrew T., *Counsel for John Doe*

- Nesenoff & Miltenberg, LLP, *Counsel for John Doe*

- Parks, Chesin & Walbert, P.C., *Counsel for John Doe*

**No. 22-13293**
**John Doe v. Emory University**

Plaintiff-Appellant John Doe is an individual and a natural person, to whom Rule 26.1 of the Federal Rules of Appellate Procedure does not apply.

No subsidiaries, conglomerates, affiliates, parent corporations, publicly held corporations owning 10% or more of any party's stock, or other identifiable legal entities relating to any party are known to Plaintiff-Appellant.


   /s *Adrienne Levy*   
Adrienne Levy, Esq.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff-Appellant John Doe respectfully requests oral argument. The district court's decision turned in part on its interpretation of *Doe v. Samford University*, 29 F.4th 675 (11th Cir. 2022), an Eleventh Circuit decision which was issued after the parties had completed their briefing below. As such, this appeal will be the first time the Eleventh Circuit will address a lower court's interpretation and application of the *Samford* decision, the Circuit's first opportunity to define the contours of this new precedent, and the parties' first opportunity to address the *Samford* decision in this case. Given the novelty and complexity of this issue, oral argument is requested.

## **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF AUTHORITIES .......................................................................v

STATEMENT OF SUBJECT-MATTER AND APPELLATE
JURISDICTION ..................................................................................1

ISSUES PRESENTED FOR REVIEW .........................................................2

STATEMENT OF THE CASE ....................................................................3

I.     Relevant Procedural History ....................................................3

II.    Statement of Relevant Facts ....................................................4

A.    Emory University Faced Public Pressure to
Aggressively Pursue and Punish Sexual Misconduct
Complaints Made by Female Students Against Male
Respondents, at the Threat of Losing Federal Funds .................4

B.    Despite New Guidance from the Department of
Education and the Rescission of the DCL, Emory Held
Fast to Policies That Minimize Due Process for
Respondents ..................................................................6

C.    Emory University Embraced and Endorsed the
Presumption that Men Are Perpetrators of Sexual
Assault and Women Are Victims ............................................8

D.    John Doe and Jane Roe ....................................................9

E.    Emory Conducts a Deficient, One-Sided Investigation
Designed Paint Plaintiff as Guilty, Regardless of the
Facts ........................................................................12

F.  Despite Already Having Procedures in Place to Conduct Disciplinary Hearings with Cross-Examination, and Despite John Doe's Repeated Requests for Same, Emory Insists on Applying an Old Version of Its Policy, Which Served the Sole Purpose of Depriving Plaintiff Fair Process ...........................15

G.  Emory Conducted a Biased, One-Sided Hearing that Presumed Plaintiff's Guilt as a Male Accused and Presumed, From the Outset, the Female Students' Credibility ......................................................................16

H.  Emory Makes a Determination Against the Substantial Weight of the Evidence, Uniformly Crediting the Women and Discrediting the Men, Despite Jane Roe's Patent Lies .............................................................17

I.  Emory's Disciplinary Process Did Not Comport with Its Contractual Obligations as Set Forth in the Sexual Misconduct Policy...............................................18

i.  John Doe and Emory Had a Contractual Relationship, and the Sexual Misconduct Policy Supplied the Terms ........................................18

ii.  Emory Violated its Contractual Obligations to Plaintiff .......................................................19

J.  Plaintiff Was Deprived Access to His Education and Materially Damaged by Emory's Conduct ...............................20

III.  Standard/Scope of Appellate Review...................................21

A.  Dismissal of Complaint for Failure to State a Claim...............21

B.  Dismissal of First Complaint with Prejudice and Denying Leave to Amend .........................................21

SUMMARY OF ARGUMENT ...........................................................22

I.  Title IX ........................................................................22

II.  Breach of Contract...........................................................23

III.  Dismissal with Prejudice ..................................................24

ARGUMENT ...................................................................................24

iii

I.    Plaintiff's Complaint Plausibly Alleges a Title IX Claim .................24

    A.    Pleading Standards and Rule 12(b)(6) Motions.......................24

    B.    Title IX Wrongful Discipline Claims .......................................27

    C.    Plaintiff Adequately and Plausibly Alleges that Emory
       Discriminated Against Him on the Basis of Sex .....................29

    D.    The District Court Erred in Dismissing Plaintiff's
       Title IX Claim ............................................................................36

II.   Plaintiff's Complaint Plausibly Alleges Breach of Contract .............38

    A.    The Precedent Is Clear: Private Colleges and
       Universities Have a Contractual Relationship with
       Their Students ............................................................................39

    B.    Plaintiff Adequately and Plausibly Alleges a
       Contractual Relationship with Emory.......................................40

    C.    The District Court Erred in Dismissing Plaintiff's
       Breach of Contract Claims.........................................................42

III.  The District Court Improperly Dismissed Plaintiff's First
    Complaint with Prejudice....................................................................45

    A.    Eleventh Circuit Precedent Disfavors Dismissals with
       Prejudice for Facial Insufficiency and Requires that
       Plaintiffs be Given at Least One Opportunity to Amend
       Before a Dismissal with Prejudice.............................................45

    B.    The District Court Erred as a Matter of Law and
       Abused its Discretion in Denying Plaintiff an
       Opportunity to Amend the Complaint ......................................50

CONCLUSION .......................................................................................52

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................... 25, 29

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007)............................................................... 25, 26, 29

*Boazman v. Econ. Lab., Inc.*,
    537 F.2d 210 (5th Cir. 1976) ........................................................45

*Bonner v. City of Prichard*,
    661 F.2d 1206 (11th Cir. 1981) ....................................................46

*Bowers v. U.S. Parole Comm'n, Warden*,
    760 F.3d 1177 (11th Cir. 2014) ............................................... 21, 47

*Brooks v. Branch Banking & Tr. Co.*,
    107 F. Supp. 3d 1290 (N.D. Ga. 2015).........................................39

*Cervantes v. Invesco Holding Co. (US), Inc.*,
    1:18-CV-02551-AT, 2019 WL 5067202 (N.D. Ga. Sept. 25, 2019) ...........51

*Darrisaw v. Pennsylvania Higher Educ. Assistance Agency*,
    949 F.3d 1302 (11th Cir. 2020) ....................................................21

*Davidson v. Maraj*,
    609 F. App'x 994 (11th Cir. 2015).................................................39

*Dixon v. Hodges*,
    887 F.3d 1235 (11th Cir. 2018) ....................................................21

*Doe v. Amherst Coll.*,
    238 F. Supp. 3d 195 (D. Mass. 2017)............................................31

*Doe v. Baum*,
    903 F.3d 575 (6th Cir. 2018) ............................................. 26, 34, 35

*Doe v. Columbia Univ.*,
    831 F.3d 46 (2d Cir. 2016) ............................................. 26, 29, 36

*Doe v. Emory Univ.*,
    2021 WL 358391 (N.D. Ga. Jan. 22, 2021) ......................................... *passim*

*Doe v. Lynn Univ., Inc.*,
  235 F.Supp. 3d 1336 (S.D. Fla. 2017) ............................................................31

*Doe v. Oberlin Coll.*,
  963 F.3d 580 (6th Cir. 2020) ................................................................. 32, 37

*Doe v. Purdue Univ.*,
  928 F.3d 652 (7th Cir. 2019) ............................................................. *passim*

*Doe v. Rensselaer Polytechnic Inst.*,
  2020 WL 6118492 (N.D.N.Y. Oct. 16, 2020) ...............................................34

*Doe v. Rollins Coll.*,
  352 F. Supp. 3d 1205 (M.D. Fla. 2019) ......................................................31

*Doe v. Samford University*,
  29 F.4th 675 (11th Cir. 2022) ............................................................. *passim*

*Doe v. Univ. of Ark. - Fayetteville*,
  974 F.3d 858 (8th Cir. 2020) ................................................................. 28, 30

*Doe v. Univ. of Denver*,
  1 F.4th 822 (10th Cir. 2021) .......................................................................34

*Doe v. Univ. of Scis.*,
  961 F.3d 203 (3d Cir. 2020) ........................................................... 28, 30, 31

*Doe v. Valencia Coll.*,
  903 F.3d 1220 (11th Cir. 2018) ...................................................................27

*Doe v. Washington & Lee Univ.*,
  No. 14-CV-00052, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015).......... 31, 35

*Doe v. Marymount Univ.*,
  297 F. Supp. 3d 573 (E.D. Va. 2018) .........................................................34

*Does 1-2 v. Regents of the Univ. of Minnesota*,
  999 F.3d 571 (8th Cir. 2021) .......................................................................34

*Foman v. Davis*,
  371 U.S. 178 (1962).............................................................................. 22, 46

*Fowlkes v. American Health Associates, Inc.*,
  1:20-CV-3646-AT, 2021 WL 9794788 (N.D. Ga. May 28, 2021) ...............50

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1998).....................................................................................27

*Gomez v. Toledo*,
    446 U.S. 635 (1980).......................................................................26

*Hunt v. Aimco Properties, L.P.*,
    814 F.3d 1213 (11th Cir. 2016) ....................................................25

*In re Bill of Lading Transmission and Processing System Patent*
    *Litigation*,
    681 F.3d 1323 (Fed. Cir. 2012) ....................................................26

*Jane Doe v. Emory University, Inc.*,
    2022 WL 17419555 (N.D. Ga. Dec. 5, 2022) .................................. 40, 41, 44

*Kalpakchian v. Bank of Am. Corp.*,
    832 Fed. Appx. 579 (11th Cir. 2020) .................................... 47, 50

*Kelly v. Kelly*,
    901 F. Supp. 1567 (M.D. Fla. 1995) ...........................................49

*Kuritzky v. Emory Univ.*,
    294 Ga. App. 370, 669 S.E.2d 179 (2008) ........................... 39, 40

*Levine v. World Fin. Network Nat. Bank*,
    437 F.3d 1118 (11th Cir. 2006) ....................................................25

*Morehouse Coll., Inc. v. McGaha*,
    277 Ga. App. 529, 627 S.E.2d 39 (2005) .....................................39

*Norris v. Univ. of Colorado, Boulder*,
    362 F. Supp. 3d 1001 (D. Colo. 2019) ........................................31

*Pierce v. Clayton Cnty., Georgia*,
    717 Fed. Appx. 866 (11th Cir. 2017) ...........................................22

*Pinder v. John Marshall Law School, LLC*,
    11 F. Supp. 3d 1208 (N.D. Ga. 2014)...........................................40

*Posner v. Essex Ins. Co., Ltd.*,
    178 F.3d 1209 (11th Cir. 1999) ....................................................49

*Rivas v. The Bank of New York Mellon*,
    676 Fed. Appx. 926 (11th Cir. 2017) ...........................................50

*Rosenberg v. Gould*,
    554 F.3d 962 (11th Cir. 2009) ....................................................49

*Santiago v. Wood*,
    904 F.2d 673 (11th Cir. 1990) ........................................................49

*Schwake v. Ariz. Bd. of Regents*,
    967 F.3d 940 (9th Cir. 2020) .........................................................28

*Sheppard v. Visitors of Va. State Univ.*,
    993 F.3d 230 (4th Cir. 2021) ........................................................28

*Shull v. Pilot Life Ins. Co.*,
    313 F.2d 445 (5th Cir. 1963) ........................................................45

*Smith v. Healthcare Auth. for Baptist Health*,
    2:20-CV-887-MHT, 2022 WL 857036 (M.D. Ala. Mar. 22, 2022).............26

*Swierkiewicz v. Sorema N. A.*,
    534 U.S. 506 (2002)........................................................ 25, 28, 29

*Teel v. Deloitte & Touche LLP*,
    3:15-CV-2593-G, 2015 WL 9478187 (N.D. Tex. Dec. 29, 2015) ...............51

*Thomas v. Farmville Mfg. Co., Inc.*,
    705 F.2d 1307 (11th Cir. 1983) ............................................. 47, 50

*Thomas v. Town of Davie*,
    847 F.2d 771 (11th Cir. 1988) ......................................... 21, 47, 50

*Unger v. Majorca at Via Verde Homeowners Ass'n Inc.*,
    21-13134, 2022 WL 4542348 (11th Cir. Sept. 29, 2022) ...........................26

*Wagner v. Daewoo Heavy Indus. Am. Corp.*,
    314 F.3d 541 (11th Cir. 2002) ............................................. *passim*

*Williams v. Corp. of Mercer Univ.*,
    542 F. Supp. 3d 1366 (M.D. Ga. 2021).................................... 39, 40, 41, 42

*Woldeab v. DeKalb Cnty. Bd. of Educ.*,
    885 F.3d 1289 (11th Cir. 2018) ....................................... 46, 49, 50

*Worthy v. City of Phenix, Ala.*,
    930 F.3d 1206 (11th Cir. 2019) ....................................... 26, 34, 42

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
    372 F.3d 899 (7th Cir. 2004) ........................................................26

*Yusuf v. Vassar Coll.*,
    35 F.3d 709 (2d Cir. 1994) ..........................................................27

**Statutes & Other Authorities:**

Article III of the United States Constitution ................................................. 1

20 U.S.C. § 1681 ............................................................................................ 1

20 U.S.C. § 1681(a) ...................................................................................... 27

28 U.S.C. § 1291 ............................................................................................ 2

28 U.S.C. § 1331 ............................................................................................ 1

28 U.S.C. § 1332 ............................................................................................ 1

28 U.S.C. § 1367 ............................................................................................ 1

Fed. R. App. P. 4(a) ....................................................................................... 2

Fed. R. Civ. P. 8 .......................................................................................... 29

Fed. R. Civ. P. 8(a) ................................................................................ 24, 28

Fed. R. Civ. P. 12(b)(6) ..................................................................... *passim*

Fed. R. Civ. P. 15 ........................................................................................ 52

Fed. R. Civ. P. 15(a) ......................................................................... 21, 22, 47

Fed. R. Civ. P. 54(b) ...................................................................................... 1

Black's Law Dictionary (11th ed. 2019) ..................................................... 28

## <u>STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION</u>

This case was filed in the United States District Court for the Northern District of Georgia, with jurisdiction based upon: (i) federal question jurisdiction, 28 U.S.C. § 1331, because the action arose out of the Constitution and laws of the United States; to wit, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*; (ii) diversity jurisdiction, 28 U.S.C. § 1332, because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000 (Plaintiff is a citizen of the state of Illinois and Defendant is a citizen of the state of Georgia); and (iii) supplemental jurisdiction, 28 U.S.C. § 1367, as Plaintiff's state law claims arise out of the same facts and circumstances as the federal claims such as to form the same case and controversy under Article III of the United States Constitution. (Doc. 1 ¶¶ 13-16).[1]

On September 1, 2022, the district court entered judgment granting Defendant Emory's Motion to Dismiss, dismissing Plaintiff's Complaint with prejudice and denying Plaintiff leave to amend. (Doc. 25; Doc. 26). This order thus disposed of all parties' claims and constitutes a final judgment under Fed. R. Civ. P. 54(b).

---

[1] Citations to the record will utilize the district court's assigned CM/ECF document and page numbers. Thus, "Doc. 25 p.13" means document 25 from the district court docket at page 15. Complaint citations will be made to paragraphs rather than page number. Citations to the Eleventh Circuit docket will be made to "11ᵗʰ Cir. Dkt."

This appeal is as of right, and the Court of Appeals has jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a). The Notice of Appeal was timely filed on September 28, 2022. (Doc. 27). On December 6, 2022, this Court granted Plaintiff's motion for an extension of time to file the opening brief to January 9, 2023. (11th Cir. Dkt 17).

## ISSUES PRESENTED FOR REVIEW

1. Did the District Court err in granting Defendant's Rule 12(b)(6) Motion to Dismiss Plaintiff's Title IX claim on the grounds that Plaintiff failed to sufficiently plead gender bias, by misinterpreting and/or misapplying *Doe v. Samford University*, 29 F.4th 675 (11th Cir. 2022), failing to accept the well-pleaded allegations in the Complaint as true, failing to view the claims in the light most favorable to Plaintiff, and failing to acknowledge case law supporting the sufficiency of the Complaint?

2. Did the district court err in dismissing Plaintiff's breach of contract claims by exclusively evaluating whether the Complaint alleged an "express contract," and failing to assess whether Plaintiff adequately alleged an "implied contract", even though the Complaint specifically referenced "implied agreements" between Plaintiff and Emory, and even though the cases cited by the district court in dismissing Plaintiff's breach of contract claims actually *supported* the adequacy of Plaintiff's allegations?

2

3. Did the district court err on the law and abuse its discretion in dismissing Plaintiff's Complaint with prejudice, in the first instance, on a Rule 12(b)(6) motion, and denying Plaintiff's request for an opportunity to amend, despite the district court making no finding that amendment would be futile, nor that Plaintiff had acted in bad faith, nor that defendant Emory would be prejudiced by permitting amendment?

## STATEMENT OF THE CASE

### I.    Relevant Procedural History

Plaintiff filed his Complaint on July 9, 2021. (Doc. 1). On September 10, 2021, Emory filed a motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). (Doc. 15). On October 15, 2021, Plaintiff filed a brief in opposition to Emory's motion to dismiss (Doc. 20). On November 15, 2021, Emory filed its reply brief in further support of its motion to dismiss (Doc. 23).

On September 1, 2022, the District Court issued a decision and order granting Emory's motion to dismiss and dismissing the Complaint in its entirety, with prejudice, and denying Plaintiff's request for an opportunity to amend (Doc. 25). The clerk entered judgment for Defendant Emory and terminated the case the same day (Doc. 26).

On September 28, 2022, Plaintiff timely filed a notice of appeal (Doc. 27). On December 6, 2022, this Court granted Plaintiff's motion for an extension of time to file the opening brief to January 9, 2023. (11 Cir. Dkt 17).

II.     <u>**Statement of Relevant Facts**</u>

The facts are set forth in full in Plaintiff's Complaint (Doc. 1), incorporated herein by reference. A summary of the relevant facts follows:

A. <u>Emory University Faced Public Pressure to Aggressively Pursue and Punish Sexual Misconduct Complaints Made by Female Students Against Male Respondents, at the Threat of Losing Federal Funds.</u>

On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a Dear Colleague Letter ("DCL") advising educational institutions receiving federal funding that sexual violence constitutes sex discrimination within the meaning of Title IX of the Education Amendments of 1972.  (Doc. 1 ¶¶18-19).  The DCL cited a subsequently-invalidated statistic that "about 1 in 5 women are victims of completed or attempted sexual assault while in college," and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." (Doc. 1 ¶¶20-22). The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" and focus on victim advocacy, and strongly discouraged allowing cross-examination.  Despite its purported purpose as a guidance letter, the Department of Education treated the DCL as binding and pressured universities to aggressively pursue investigations of sexual assault on campus. (Doc. 1 ¶¶23-25).

On April 29, 2014, OCR issued additional directives aimed at addressing the procedures universities "must" employ "to prevent sexual violence and resolve

4

complaints," including: (i) adopting a "trauma-informed" approach to sexual misconduct complaints; (ii) permitting schools to eliminate any form of cross-examination, and (iii) directing schools to minimize the number of times that an accuser would have to give their story. (Doc. 1 ¶¶ 28-30). In other words, schools were directed to minimize the manner and opportunity by which a complainant's credibility might be questioned. *Id.*

In the same month, OCR warned that if it found a school in violation of Title IX, the "school risks losing federal funds." (Doc. 1 ¶ 32). To support enforcement of the DCL, conducted over five hundred investigations for the potential mishandling of sexual misconduct complaints. (Doc. 1 ¶34). On September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for women. (Doc. 1 ¶ 38).

As OCR's focus on sexual misconduct came to a head, OCR publicly announced it would be investigating Emory University's compliance with Title IX; the investigation was then discussed in Emory's campus newspaper. (Doc. 1 ¶ 35). Emory was no stranger to receiving public attention for allegedly failing to protect female students from sexual misconduct: in 1991, hundreds of students marched in protest of Emory's perceived inaction regarding complaints by thirteen women that a

5

male professor engaged in harassing behavior. (Doc. 1 ¶ 68). OCR's 2014 investigation into Emory went on for approximately *five years*, concluding in 2019 by way of a resolution agreement, which was intended to address numerous inadequacies found by OCR concerning Emory's handling of sexual misconduct claims. (Doc. 1 ¶ 36).

B. Despite New Guidance from the Department of Education and the Rescission of the DCL, Emory Held Fast to Policies That Minimize Due Process for Respondents.

In 2017, the Department of Education rescinded the DCL and issued new guidance on Title IX (the "2017 Q&A"), declaring that "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." (Doc. 1 ¶¶ 42-46). The Department of Education noted the DCL had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." (Doc. 1 ¶ 47).

The 2017 Q&A cautioned that "[t]raining materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds impartially." (Doc. 1 ¶¶ 48-49).  It also required investigators to address exculpatory evidence and

6

directed that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." (Doc. 1 ¶¶ 50-52). The 2017 Q&A suggests that the policies and procedures utilized by Emory in this case—which were tailored to comply with the now-rescinded DCL—were unfair and, ultimately, contrary to the goal of gender equity in Title IX proceedings. (Doc. 1 ¶ 54). Indeed, Emory announced in November 2017 that, despite the rescission of the DCL and OCR's new focus on due process and fundamental fairness, it would *not* change its policies to comply with the new guidance. (Doc. 1 ¶¶ 47, 55).

On May 6, 2020, the Department of Education released new Title IX regulations (the "2020 Title IX Final Rule") effective August 14, 2020. (Doc. 1 ¶¶ 60-61). The new regulations required schools to provide the following rights and procedural protections to respondents in sexual misconduct disciplinary proceedings: (i) the presumption of innocence and notice to respondents of this right; (ii) the right to a live hearing with cross-examination to be done directly, orally, and in real time by the party's advisor of choice; (iii) objective evaluation of *all* relevant evidence, including exculpatory evidence; (iv) equal opportunities to present facts and evidence as between complainant and respondent; and (v) the avoidance of

credibility determinations based upon status as complainant or respondent. (Doc. 1 ¶ 66).

C. Emory University Embraced and Endorsed the Presumption that Men Are Perpetrators of Sexual Assault and Women Are Victims.

In 2013, Emory's "Office of Respect" hosted the inaugural "RespectCon" a sexual assault awareness event which was reported by the school paper as focusing on "engaging men in sexual violence prevention." (Doc. 1 ¶ 70). Emory's 2014 "RealConsent" program comprised a sexual assault educational program "for college males." (Doc. 1 ¶71). In 2018, Emory was sued by a male student who alleged that he was falsely found responsible for sexual misconduct through a process that was biased against men. (Doc. 1 ¶ 72). In 2019, Emory's Office of Respect hosted "RespectCon19," which featured a talk about the "Definition of Male Sexual Violence against Women: Implications for Engaging Men on Campus" as well as a discussion called "Masculinity as a Failed Project." (Doc. 1 ¶ 73).

As the result of the five-year OCR investigation and Emory's long-institutionalized bias presuming men are sexual assailants and women are victims, Emory ultimately pursued baseless sexual assault claims against Plaintiff in a manner designed to find him guilty based on a preconceived notion of his guilt as a male accused. (Doc. 1 ¶ 74).

D. <u>John Doe and Jane Roe.</u>

Plaintiff John Doe grew up in Chicago and at all relevant times was a citizen of Illinois. (Doc. 1 ¶¶ 13, 75). Plaintiff's stellar academic record and hard work gave him many options for college, but he ultimately selected Emory. (Doc. 1 ¶¶ 75-77). Plaintiff matriculated to Emory in Fall 2018 and excelled both academically and professionally, developing a sterling reputation, networking, and building his resume/credentials to set himself up for a successful future. (Doc. 1 ¶¶ 77-79). Plaintiff served on Emory's Interfraternity Council as well as S.A.F.E. Greeks, through which he spent substantial time educating other Emory students about sexual assault awareness and prevention. (Doc. 1 ¶ 78).

Plaintiff met Jane Roe, a fellow Emory student, in early April 2019. (Doc. 1 ¶ 81).  On April 20, 2019, Plaintiff's fraternity hosted a "White Claw" party,[2] which Jane Roe attended. (Doc. 1 ¶ 82). Plaintiff smoked marijuana in the morning before the party, but did not smoke during the party nor his interactions with Jane Roe that day. Plaintiff did not drink alcohol at the party. (Doc. 1 ¶ 83).

Around 4:00pm, Jane Roe approached Plaintiff, and at her friend's request, flirted with him to try and get Plaintiff to facilitate the girls' smoking marijuana at 4:20pm.  (Doc. 1 ¶ 84). Plaintiff, Jane Roe, her friend E.R., and Plaintiff's friend I.K. all went to Plaintiff's bedroom, but ultimately were unable to locate any

---

[2] White Claw is a brand of hard seltzer.

marijuana to smoke. Plaintiff put on some music, and he, Roe, and I.K. hung out in his room for a bit.  I.K. left to rejoin the party, and Plaintiff went to use his bathroom (which was connected to his bedroom) before doing same. (Doc. 1 ¶¶ 85-86).  When Plaintiff came out of his bathroom, Jane Roe was still in his room, and had moved to his bed.  The door to Plaintiff's room was unlocked. (Doc. 1 ¶ 86).

After talking for a few minutes, Roe leaned in and kissed Plaintiff, and he reciprocated.  Plaintiff was very sexually inexperienced, having only had sex with his high school girlfriend, whereas Roe was more experienced and quite sexually aggressive, to the point of making Plaintiff uncomfortable. (Doc. 1 ¶ 87). At one point, Plaintiff ceased kissing Roe and stood up to change the music; Roe mocked him for stopping their make-out session. Plaintiff returned to the bed and explained that he was not really enjoying the kissing, at which point Jane Roe enthusiastically volunteered that she was "really good" at performing oral sex. (Doc. 1 ¶ 89). Jane Roe then unbuttoned Plaintiff's pants, pulled his pants and underwear down, and began performing oral sex on Plaintiff.  Roe's aggressive sexual style was not working for Plaintiff, and he grew increasingly uncomfortable.  Plaintiff reached for his phone to change the music again, hoping to break up the awkwardness, and Jane Roe got annoyed. (Doc. 1 ¶¶ 90-91).

Plaintiff pulled his underwear back up and stated that he would rather have intercourse than continue receiving oral sex, if Roe was interested in that.  Roe

verbally consented to sexual intercourse with Plaintiff, and began removing her shirt. (Doc. 1 ¶ 91). Plaintiff retrieved and put on a condom. Jane Roe removed her shorts and underwear, and got on top of Plaintiff on his bed, where the two began to kiss again. (Doc. 1 ¶ 92). While they were kissing, Jane Roe pressed her body against Plaintiff's, but there was no vaginal penetration, as Plaintiff was not fully aroused – which appeared to irritate Roe. (Doc. 1 ¶ 93). Plaintiff continued to feel awkward and paused the encounter again to use his bathroom. (Doc. 1 ¶ 94). While Plaintiff was in the bathroom, Jane Roe texted a friend, "we're fucking oh no." Jane Roe gave no indication of any assault. *Ibid.*

When Plaintiff returned from the bathroom, he asked Jane Roe if she wanted to rejoin the party; Roe said "sure," but seemed angry that Plaintiff was not interested in continuing their sexual encounter. (Doc. 1 ¶ 95). As Plaintiff and Roe got dressed, Plaintiff's friend J.M. entered the bedroom through the unlocked door and sat on the couch. Jane Roe showed no signs of duress or intoxication. (Doc. 1 ¶ 96).

Jane Roe asked Plaintiff if he wanted to rejoin the party with her; he stated he would come out of his room later, and Jane Roe left. (Doc. 1 ¶97). After rejoining the party, Jane Roe showed no signs of duress, and proceeded to stay at the party, dance, play drinking games, and flirt with other men, ultimately having sex with another man at the party, J.A. (Doc. 1 ¶98). Later that day, Jane Roe, J.A., and some

11

friends went to dinner together, at which Jane Roe appeared happy and in control of herself. (Doc. 1 ¶ 99).

E. <u>Emory Conducts a Deficient, One-Sided Investigation Designed Paint Plaintiff as Guilty, Regardless of the Facts</u>

On November 6, 2019, Jane Roe filed a complaint against Plaintiff with Emory's Title IX Office, falsely alleging nonconsensual sexual contact and nonconsensual intercourse stemming from their April 20, 2019 encounter; Plaintiff was notified of the complaint the next day (Doc. 1 ¶¶101-103). Jane Roe also filed a complaint with the Title IX office against J.A. for their sexual encounter at the party. (Doc. 1 ¶¶ 98, 114). Roe's complaint against Plaintiff did not allege intoxication or incapacitation as the basis for her lack of consent; rather, Roe fabricated a violent assault in which she claimed that Plaintiff choked her with her own belt. (Doc. 1 ¶¶102-103).

On December 7, 2019, Plaintiff was interviewed by Emory's investigator, Laura Yearout.  Yearout seemingly did nothing for six weeks, then interviewed Jane Roe on January 24, 2020. (Doc. 1 ¶¶ 104-106).

In Jane Roe's interview, she repeated the claim in her written complaint that Plaintiff assaulted her by choking her with her own belt. Roe also stated that she did not author the written complaint herself, but refused to identify who did. (Doc. 1 ¶ 105). Jane Roe told Yearout that Plaintiff forcibly removed her pants, held her down on the bed, and choked her with her own belt while it was still in the loops

of her pants, forcing her into intercourse.  She also claimed Plaintiff's bedroom door was locked during the encounter, and that Plaintiff looked through a "peephole" in his door in order to deny entry to a friend of Roe's.  (Doc. 1 ¶ 106-107).

In reality, as photo evidence proved, Plaintiff's door had no peephole, and the door could not have been locked given that J.F. was able to walk right in. *Ibid.* Critically, Jane Roe told the investigator that she was *not* intoxicated during the encounter with Plaintiff, stating she only consumed a Mike's Hard Lemonade and a shot at around 2:30pm on the day in question, and nothing else before the encounter. Roe confirmed that she was *not* incoherent and was "very aware" during the encounter. (Doc. 1 ¶ 108).

Throughout the interview, Yearout asked Jane Roe numerous leading questions designed to create a narrative of assault and implicate Plaintiff's guilt, rather than to actually get at the truth.  For example, Jane Roe described kissing Plaintiff as something that she "just let [] happen." Rather than asking Jane Roe to clarify what she meant by this, the investigator *suggested* a scenario consistent with nonconsent and asked Roe to confirm: "he was kissing you and you were *withdrawing away* from him?" (Doc. 1 ¶ 109).

The investigation then came to a halt, with Emory failing to provide any status updates or explanation to Plaintiff. (Doc. 1 ¶ 110). On April 30, 2020, after seemingly doing nothing for three months, Emory notified Plaintiff that a new

investigator was taking over; he was not provided any explanation for the change. (Doc. 1 ¶¶ 110-111).

The new investigator did not conduct real-time interviews with the witnesses; instead, she submitted written questions via email. (Doc. 1 ¶ 113). The investigator's emails asked Jane Roe and her witnesses questions about Roe's claims against both Plaintiff *and* J.A.; however, Emory refused to give Plaintiff access to any information pertaining to the J.A. claims, even though they stemmed from the same set of events and took place close in time. Thus, Plaintiff did not have access to statements by Jane Roe and her witnesses about Jane Roe's actions and condition proximate in time to Plaintiff's encounter with Jane Roe – but all of the women in the case did. (Doc. 1 ¶ 114).

On June 2, 2020, in written submissions to the investigator, Jane Roe claimed for the first time that she was "showing signs" of intoxication during her encounter with Plaintiff and he knew she was "drunk." (Doc. 1 ¶ 115). On September 8, 2020, Jane Roe submitted further written submissions, now claiming that during the encounter with Plaintiff, her pants and belt were actually on the floor—*not* being held against her neck, as she had claimed in her written complaint and first interview. (Doc. 1 ¶ 117).

As Emory's Fall 2020 semester began, it had in place new procedures for adjudicating Title IX complaints, as required by the 2020 Title IX Final Rule. These

new procedures included, *inter alia*, a right to cross-examination at a live hearing. (Doc. 1 ¶ 116). Over the next few months, Plaintiff repeatedly requested that Emory apply its 2020-compliant hearing procedures to his case with Jane Roe, but Emory refused to afford Plaintiff the federally mandated hearing process that Emory already had in place to ensure fairness and reliable outcomes. (Doc. 1 ¶¶ 116, 121-123).

On October 19, 2020, Emory issued an investigation report containing non-probative, irrelevant information solely designed to smear Plaintiff's character, such as a bald claim by Roe that "a lot of girls" at Emory were "scared" of Plaintiff (but no names or testimony for those alleged women), and that Plaintiff was "the biggest stoner at Emory." Plaintiff submitted a lengthy and detailed response to the report, calling attention to numerous inaccuracies, contradictions, and improper character assassination by Roe and her witnesses, but the investigator summarily ignored these concerns. (Doc. 1 ¶ 118-120).

F. <u>Despite Already Having Procedures in Place to Conduct Disciplinary Hearings with Cross-Examination, and Despite John Doe's Repeated Requests for Same, Emory Insists on Applying an Old Version of Its Policy, Which Served the Sole Purpose of Depriving Plaintiff Fair Process.</u>

On November 12, 2020, Emory notified Plaintiff that he was being charged with nonconsensual sexual contact and nonconsensual intercourse. The notice made no mention of an incapacitation claim and only cited to general policy language. (Doc. 1 ¶ 120). On February 16, 2021, over Plaintiff's objections, Emory held a hearing to resolve Roe's claims utilizing the old hearing procedures that precluded

15

cross-examination, rather than the 2020-compliant procedures Emory was already required to have had in place for six months. (Doc. 1 ¶121-123).

G. Emory Conducted a Biased, One-Sided Hearing that Presumed Plaintiff's Guilt as a Male Accused and Presumed, From the Outset, the Female Students' Credibility.

Emory conducted John Doe's hearing in a one-sided manner cutting exactly across gender lines, whereby Jane Roe and the female witnesses were treated more kindly, presumed to be truthful, and given advantages/deference not afforded to Plaintiff or his male witnesses. (Doc. ¶¶ 5, 124-125).  For example: (i) Jane Roe was permitted to have *three* advisors and directly address Plaintiff in her opening statement, while Plaintiff was not allowed same; (ii) the panel refused to ask questions submitted by Plaintiff that went to the heart of Roe's credibility, condition and intoxication level on the day in question, while permitting the female witnesses to testify about those very same matters; and (iii) the panel was warm and gentle in asking minimal, softball questions that deliberately avoided impeaching Jane Roe or the female witnesses' credibility, while subjecting Plaintiff to a pointed interrogation designed to impeach his credibility and treating the male witnesses with hostility and skepticism. (Doc. 1 ¶¶ 5, 124-128). The chair of the hearing panel revealed his own presumption of Plaintiff's guilt at the outset, by introducing Plaintiff's testimony as "what *he thinks* went on," in a hostile tone—an overtly doubtful assessment that was not applied to any of the women who testified. (Doc. 1 ¶ 129).

16

At the hearing, Jane Roe directly contradicted the allegations in her written complaint and first investigative interview, now asserting—for the first time—that she was *severely intoxicated* for the *entire day* leading up to and following her encounter with Plaintiff, and admitting that Plaintiff did not choke her. (Doc. 1 ¶125). Roe stated that she lied in her initial interview (wherein she confirmed repeatedly that she was sober, "very aware" and "not incoherent") because she thought it would be better for her case. *Ibid.*  Three male witnesses testified at the hearing (four including Plaintiff) that Jane Roe was not intoxicated at the time of her encounter with Plaintiff.  (Doc. 1 ¶133).

H. <u>Emory Makes a Determination Against the Substantial Weight of the Evidence, Uniformly Crediting the Women and Discrediting the Men, Despite Jane Roe's Patent Lies.</u>

On March 2, 2021, Emory notified Plaintiff that he was found responsible for nonconsensual sexual contact and nonconsensual intercourse and would be suspended for one semester. (Doc. 1 ¶ 130). In the outcome letter, the hearing panel found that Jane Roe could not provide "informed consent" to sexual activity due to her "intoxication"; however, the Sexual Misconduct Policy requires "affirmative consent", not "informed consent", and the Policy expressly states that intoxication alone is *not* preclusive of affirmative consent, rather, it must rise to the level of "incapacitation." (Doc. 1 ¶ 148(a)).

17

The panel provided little substantive reasoning or evidence for its finding, other than declaring that Jane Roe was more credible than Plaintiff. In making this assessment, the panel *entirely ignored* Jane Roe's 180-degree turnabout from her complaint and interview to the hearing, as well as her statement to the panel that *she lied to the investigator because she thought it would be more advantageous to her case*. With respect to Plaintiff, however, the panel did not believe that Plaintiff didn't smoke pot during the party, and then concluded this one purported lie vitiated his credibility altogether. (Doc. 1 ¶¶130-133). Regarding witness testimony, the female witnesses were uniformly credited over the male witnesses. (Doc. 1 ¶ 133).

Plaintiff timely appealed the decision on March 22, 2021, but Emory denied his appeal as a matter of course. (Doc. 1 ¶ 135-136).

I. Emory's Disciplinary Process Did Not Comport with Its Contractual Obligations as Set Forth in the Sexual Misconduct Policy.

i. John Doe and Emory Had a Contractual Relationship, and the Sexual Misconduct Policy Supplied the Terms.

At all times relevant to the Complaint, Plaintiff was a full-time, tuition-paying student at Emory University (Doc. 1 ¶ 13). Emory had in place a Sexual Misconduct Policy (hereinafter, "the Policy") outlining prohibited conduct and Emory's procedures for addressing alleged sexual misconduct, which it published to students and which it required students to comply with (as evidenced by the findings and sanctions against Plaintiff for allegedly violating the Policy). (Doc. 1 ¶¶ 136, 138,

18

142-148). Thus, a contractual relationship existed between Plaintiff and Emory through Emory's course of conduct in dissemination and enforcement of the Sexual Misconduct Policy, and Plaintiff's rendering of consideration including tuition payments and compliance with the Policy. (Doc. 1 ¶ 176).

ii. Emory Violated its Contractual Obligations to Plaintiff

Throughout Plaintiff's disciplinary proceedings, Emory breached express promises in the Sexual Misconduct Policy, including the following:

(i) "The Title IX Coordinator for Students will ensure prompt, fair, and impartial investigations and resolutions of complaints alleging violations of this Policy." (Doc. 1 ¶ 142).

(ii) "Emory will endeavor to complete the investigation and resolution of a complaint in a prompt and timely manner; the Title IX Coordinator for Students will keep the parties apprised of the status of their case on a periodic basis." (Doc. 1 ¶ 143).

(iii) "The procedures for institutional disciplinary action will be conducted by [individuals] who receive annual training on this Policy and the skills necessary to complete their roles in the Title IX process." (Doc. 1 ¶ 144).

(iv) "[W]ithin 7 business days after the Report of Investigation is completed or supplemented, a written 'Notice of Charges of Policy Violation'

('Notice of Charges') will be provided to the Respondent and the Complainant with summary information that supports the charge(s)." (Doc. 1 ¶ 145).

(v)    "[A]ll parties involved receive appropriate support and fair treatment, and . . . allegations of sexual misconduct are handled in a prompt, thorough and equitable manner." (Doc. 1 ¶ 146).

(vi)    The hearing "shall be non-adversarial in nature." (Doc. 1 ¶ 147).

On information and belief, Emory applied its Sexual Misconduct policy in a manner that resulted in harsher penalties for males accused of sexual misconduct as opposed to females. (Doc. 1 ¶¶ 57, 139).

J.  <u>Plaintiff Was Deprived Access to His Education and Materially Damaged by Emory's Conduct.</u>

As the result of Emory's unjustified and improper conduct, Plaintiff was suspended from Emory, depriving him of educational access. (Doc. 1 ¶ 130, 150). Further, Emory's suspension precluded Plaintiff from graduating on time, which then rendered him ineligible for a highly competitive, lucrative, full-time job Plaintiff had previously secured for after his planned graduation in May 2021. (Doc. 1 ¶¶77, 150, 184-185). Emory's findings have also marred Plaintiff's reputation and educational records with a false finding of sexual misconduct. (Doc. 1 ¶¶ 149, 151-156).

## III.  **Standard/Scope of Appellate Review**

### A. Dismissal of Complaint for Failure to State a Claim

A district court's dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is reviewed *de novo*. *Darrisaw v. Pennsylvania Higher Educ. Assistance Agency*, 949 F.3d 1302, 1304 (11th Cir. 2020). "On review, the allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff." *Dixon v. Hodges*, 887 F.3d 1235, 1237 (11th Cir. 2018) (citation omitted).

### B. Dismissal of First Complaint with Prejudice and Denying Leave to Amend

A district court's dismissal with prejudice and denial of leave to amend a first complaint, upon a motion to dismiss for failure to state a claim, is reviewed for abuse of discretion. *Bowers v. U.S. Parole Comm'n, Warden*, 760 F.3d 1177, 1183 (11th Cir. 2014). In this context,

> [The] district court's discretion to dismiss a complaint without leave to amend is "severely restrict[ed]" by Fed. R. Civ. P. 15(a), which directs that leave to amend "shall be freely given when justice so requires." "[U]nless there is a **substantial** reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial."

*Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988) (emphasis added) (citation omitted). As the Supreme Court has made clear,

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

A district court's interpretation and application of law in denying leave to amend is reviewed *de novo*. *Pierce v. Clayton Cnty., Georgia*, 717 Fed. Appx. 866, 871 (11th Cir. 2017) (reviewing district court's "futility" determination *de novo*).

## SUMMARY OF ARGUMENT

### I.    Title IX

The well-pleaded factual allegations in the Complaint, taken as true and viewed in the light most favorable to Plaintiff, plausibly allege that Emory discriminated against Plaintiff on the basis of sex when it wrongly found him responsible for sexual misconduct and suspended him. The allegations in the Complaint, including (i) federal and student body pressure on Emory to aggressively pursue and punish sexual assault claims, particularly against men; (ii) procedural irregularities and Emory's disparate treatment of male versus female students involved in Plaintiff's case; (iii)  a decision in favor of the female student that was

22

substantially against the weight of the evidence; and (iv) statements and actions of university officials indicating a presumption that men are sexual assailants and women are victims, and that female complainants are presumptively credible, collectively serve to plausibly allege that gender bias caused Emory's erroneous decision and suspension of Plaintiff.

The district court erred in dismissing Plaintiff's Title IX claim by failing to apply the appropriate standard on a Rule 12(b)(6) motion, ignoring Plaintiff's well-pleaded factual allegations and interpreting the facts in the light *least* favorable to him, including by failing to read Plaintiff's allegations collectively.

## II.    <u>Breach of Contract</u>

The well-pleaded factual allegations in the Complaint, taken as true and viewed in the light most favorable to Plaintiff, plausibly allege that Plaintiff and Emory had a contractual relationship, that Emory's Sexual Misconduct Policy provided terms for the contract, and that Emory breached said contractual terms, harming Plaintiff.

The district court erred in dismissing Plaintiff's contract claims by: (i) failing to evaluate the Complaint under an implied contract theory; (ii) failing to view the allegations in the light most favorable to Plaintiff; and (iii)  purporting to rely on certain cases in dismissing Plaintiff's contract claims, where those very cases

actually *supported* the sufficiency of the Complaint—including other cases against Emory University.

### III.    Dismissal with Prejudice

The district court erred as a matter of law and abused its discretion by dismissing Plaintiff's complaint with prejudice, in the first instance, and denying Plaintiff an opportunity to amend, despite making *no* finding that amendment would be futile, nor that Plaintiff engaged in bad-faith conduct.

The district court erred as a matter of law by failing to acknowledge Eleventh Circuit precedent mandating that district courts permit plaintiffs at least one opportunity to amend before a dismissal with prejudice in circumstances such as those present here.  The district court also abused its discretion by refusing to grant Plaintiff a single opportunity to amend his complaint, where there was no basis to believe that amendment would be futile, nor that Plaintiff engaged in misconduct, nor that Emory would be prejudiced thereby; thus, there was no substantial justification to deny leave to amend.

### ARGUMENT

### I.    Plaintiff's Complaint Plausibly Alleges a Title IX Claim

A. Pleading Standards and Rule 12(b)(6) Motions

Under Federal Rule of Civil Procedure 8(a), a complaint need only "give [defendant] fair notice of what [plaintiff]'s claims are and the grounds upon which

they rest." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514–15 (2002). As long as a complaint "present[s] a plausible set of facts from which we can infer that" the elements of a cause of action are present, a plaintiff "has sufficiently pled his claim." *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1225 (11th Cir. 2016).

"When considering a motion to dismiss, the pleadings are construed broadly so that all facts pleaded therein are accepted as true, and all inferences are viewed in the light most favorable to the plaintiff." *Levine v. World Fin. Network Nat. Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006). Although a court need not credit "a legal conclusion couched as a factual allegation, . . . [w]hen there are well-pleaded factual allegations, a court should assume their veracity." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Supreme Court has expressly warned that notice-pleading "does **not** impose a probability requirement at the pleading stage." *Bell Atl. v. Twombly*, 550 U.S. 544, 556 (2007) (emphasis added). To the contrary, "a complaint must be allowed to proceed 'even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely.'" *Doe v. Samford Univ.,* 29 F.4th 675, 695–96 (11th Cir. 2022) (Jordan, J., Concurring) (alteration in original) (quoting *Twombly*, 550 U.S. at 556). Thus, "**when there are two equally plausible ways to read a complaint, we should adopt the reading**

that is most favorable to [the plaintiff]." *Worthy v. City of Phenix, Ala.,* 930 F.3d 1206, 1214 (11th Cir. 2019) (emphasis added).

With respect to discrimination claims, "*Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Doe v. Columbia Univ.,* 831 F.3d 46, 57 (2d Cir. 2016). As such, "alternative explanations [for the University's conduct] are not fatal to [Plaintiff]'s ability to survive a Rule 12(b)(6) motion." *Doe v. Baum,* 903 F.3d 575, 587 (6th Cir. 2018). *See also In re Bill of Lading Transmission and Processing System Patent Litigation*, 681 F.3d 1323, 1340 (Fed. Cir. 2012) ("Nothing in *Twombly* or its progeny allows a court to choose among competing inferences [to dismiss a complaint,] as long as there are sufficient facts alleged to render the non-movant's asserted inferences plausible."); *Smith v. Healthcare Auth. for Baptist Health*, 2:20-CV-887-MHT, 2022 WL 857036, at *3 (M.D. Ala. Mar. 22, 2022) (declining to dismiss discrimination complaint despite defendant's purported non-discriminatory explanation for its conduct).

Finally, "plaintiffs need not anticipate and attempt to plead around all potential defenses" in order to survive a motion to dismiss. *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)). *See also Unger v. Majorca at Via Verde Homeowners Ass'n Inc.*,

21-13134, 2022 WL 4542348, at *3 (11th Cir. Sept. 29, 2022) (reversing dismissal,

holding that at the pleading stage, a plaintiff need not disprove defendant's available

defenses).

B. Title IX Wrongful Discipline Claims

Title IX of the Education Amendments of 1972 states: "No person in the

United States shall, on the basis of sex, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any education program or

activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Private parties

may enforce Title IX. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281

(1998).

Title IX "bars the imposition of university discipline where gender is a

motivating factor." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *see also*

*Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018). While there are many

theories under which a plaintiff alleging a Title IX claim for wrongful discipline

might prove gender bias—such as the "erroneous outcome" or "selective

enforcement" theories espoused in *Yusuf*, 35 F.3d 715—circuit courts around the

country have adopted a broader approach to Title IX claims, finding that erroneous

outcome and selective enforcement may be *sufficient* ways to state a Title IX claim,

but they are not *necessary*. As the Seventh Circuit put it, there is "no need to

superimpose doctrinal tests on the statute." *Doe v. Purdue Univ.*, 928 F.3d 652, 667

(7th Cir. 2019). Instead, courts "prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against [plaintiff] 'on the basis of sex'"? *Id.* at 667-68. *See also Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020) (adopting *Purdue* test); *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021) (same); *Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858, 864-65 (8th Cir. 2020) (same); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020) (same).

In March 2022, the Eleventh Circuit followed suit, framing the relevant inquiry as follows: "We ask whether the alleged facts, if true, permit a reasonable inference that the university discriminated against Doe on the basis of sex." *Doe v. Samford Univ.*, 29 F.4th 675, 687 (11th Cir. 2022).[3] This reading is consistent with the Supreme Court's declaration in *Swierkiewicz* that federal discrimination statutes are *not* subject to a heightened pleading standard, but rather, need only satisfy Rule 8(a): "A requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial

---

[3] The *Samford* Court stated it was adopting and "modifying" the *Purdue* standard by replacing "plausible" with the word "reasonable", *id.* at 687; however, the Court did not explain the meaning/impact of such a distinction. Respectfully, Black's Law Dictionary defines "plausible" and "reasonable" as synonyms of each other, seemingly rendering the modification in *Samford* to be a distinction without a difference. *Compare, Reasonable*, Black's Law Dictionary (11th ed. 2019), *with Plausible*, Black's Law Dictionary (11th ed. 2019).

interpretation." 534 U.S. 506, 514–15 (2002) (citation and quotations omitted).[4] *See also Iqbal*, 556 U.S. at 678 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era[.]").

Thus, in order for Plaintiff's Title IX claim to survive, he need only present sufficient factual matter to create a reasonable/plausible inference that Emory acted with gender bias when it found him responsible for sexual misconduct and suspended him. Hypothetical non-discriminatory explanations for Emory's conduct are of no moment here; at the motion-to-dismiss stage, the court "is not engaged in an effort to determine the true facts." *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016); *Purdue*, 928 F.3d at 656 ("[O]ur task is not to determine what allegations are supported by the evidence[,] but to determine whether [plaintiff] is entitled to relief if everything that he says is true.").

C. <u>Plaintiff Adequately and Plausibly Alleges that Emory Discriminated Against Him on the Basis of Sex</u>

Plaintiff's Complaint alleges: (i) federal and student body pressure on Emory University to aggressively pursue and punish sexual misconduct complaints made by women, against men (Doc. 1 ¶¶ 18-41, 55, 68-69); (ii) procedural defects that uniformly benefitted the female student and prejudiced the male student (Doc. 1 ¶¶ 102-104, 109-135); (iii) a responsibility determination substantially

---

[4] The Supreme Court reaffirmed *Swierkiewicz* in *Twombly*, 550 U.S. 544.

against the weight of the evidence (Doc. 1 ¶¶ 81-100, 118-119, 125-126, 130-133); (iv) disparate treatment as between the male and female students involved in Plaintiff's disciplinary matter, including the panel's decision to uniformly credit the female students and discredit the male students, despite significant evidence that Jane Roe was not credible (Doc. 1 ¶¶ 124-129, 131-133); and (v) years of programming at Emory indicating a presumption that men are sexual assailants and women are victims of male sexual abuse, plus a lawsuit in 2018 by another Emory student concerning Emory's "biased assumptions that female students would not make false accusations of sexual assault against their fellow male statements", plus statements by a member of Plaintiff's hearing panel indicating a presumption that Plaintiff, the male respondent, was inherently less credible than Jane Roe, the female complainant (Doc. 1 ¶¶ 70-74, 128-129). These are precisely the types of allegations that courts across the country—including cases cited by district court below and this Court in *Samford*—have held sufficient to state a Title IX claim.

By way of example, in *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858 (8th Cir. 2020), the Eighth Circuit held that allegations of a university's disciplinary decision being against the weight of the evidence, combined with external pressure on the school to better protect female students on campus from sexual assault, were collectively sufficient indicia of gender bias to preclude dismissal on the pleadings. *Id.* at 865-66. In *Doe v. University of the Sciences*, the Third Circuit reversed a lower

court's dismissal of the plaintiff's Title IX complaint, finding the following factual

allegation(s), when combined with allegations indicating the university's decision

was erroneous, sufficed to state a Title IX claim:

> There has been substantial criticism of universities, both in the student body and in the public media, accusing schools of not taking seriously complaints of female students alleging sexual assault by male students. On information and belief, the University's administration was cognizant of, and sensitive to, these criticisms. As a result, the University's decision-makers and its investigators were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they failed to protect female students from sexual assault.

961 F.3d 203, 209 (3d Cir. 2020). *See also Doe v. Rollins Coll.*, 352 F. Supp. 3d

1205, 1210-11 (M.D. Fla. 2019) (flawed investigation plus "campus scrutiny over

its treatment of sexual assault complaints by female students"); *Doe v. Lynn Univ.,

Inc.*, 235 F.Supp.3d 1336, 1340–42 (S.D. Fla. 2017) (doubtful outcome plus

allegations that university was reacting to "pressure from the public and the parents

of female students" to punish males); *Norris v. Univ. of Colorado, Boulder,* 362 F.

Supp. 3d 1001, 1012 (D. Colo. 2019); *Doe v. Amherst Coll.*, 238 F.Supp.3d 195, 223

(D. Mass. 2017); *Doe v. Washington & Lee Univ.*, No. 14-CV-00052, 2015 WL

4647996, at *10 (W.D. Va. Aug. 5, 2015) (allegations that university had "a practice

of railroading accused students," plus pressure from the OCR).

31

With respect to alleging a decision against the weight of the evidence, the Complaint alleges that: Jane Roe was perfectly coherent, and if anything, was the sexual aggressor during her encounter with Plaintiff (Doc. 1 ¶¶ 84-99); Plaintiff plus three witnesses testified that Jane Roe was not intoxicated (Doc. 1 ¶ 133, 169(g)); Jane Roe herself initially stated that she was "not incoherent – very aware" during the encounter (Doc. 1 ¶¶102-103,108); and Jane Roe made numerous demonstrably false claims to the investigator (Doc. 1 ¶¶ 106-107). Yet, the hearing panel found Plaintiff responsible for sexual misconduct on the basis that Jane Roe could not give "informed consent" due to "intoxication," even though *neither* intoxication *nor* a lack of "informed consent" are the requisite elements of a policy violation under Emory's Sexual Misconduct Policy (Doc. 1 ¶ 148). Jane Roe also completely changed her claim of non-consent from her initial complaint and interview to the hearing, originally stating she was perfectly coherent and could not consent because Plaintiff violently choked her with her own belt, but testifying at the hearing that she could not consent because she was extremely intoxicated and Plaintiff did *not* choke her. (Doc. 1 ¶¶ 102, 105-108, 125).

As the Sixth Circuit has noted, "when the degree of doubt [of the accuracy of the decision] passes from articulable to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias." *Doe v. Oberlin Coll.*,

32

963 F.3d 580, 588 (6th Cir. 2020); *Samford*, 29 F.4th at 697-98.[5] Such is the case here.

With respect to procedural irregularities, the Complaint alleges that Emory refused to provide Plaintiff with a hearing that included cross-examination, even though Emory was already required by law to have such processes in place at the time of Plaintiff's hearing, and even though credibility was central to resolving Jane Roe's allegations. (Doc. 1 ¶¶ 116, 121-123). In addition, Jane Roe, her female witnesses, and the female investigator were all privy to information about Jane Roe's conduct immediately after/close in time to her encounter with Plaintiff, yet such information was withheld from Plaintiff. (Doc. 1 ¶¶ 114). Jane Roe was also given preferential treatment at the hearing, including the panel's presumption that Jane Roe was credible and refusal to ask questions relevant to her credibility (Doc. 1 ¶¶ 124-129). The hearing panel also uniformly credited the female witnesses over the male witnesses. (Doc. 1 ¶¶ 133, 169(g)). Emory also failed to provide Plaintiff with adequate notice of the charges, as the notice and

---

[5] In *Samford*, this Court held the university's finding was not unsupportable, because although the complainant switched from claiming she was incapacitated by drugs to claiming she was incapacitated by alcohol, she never waivered in her assertion that she was incapacitated. 29 F.4th at 690-91. That is not the case here, where Jane Roe initially claimed she was sober and subjected to a violent, forced encounter, but then claimed the exact *opposite* at the hearing. (Doc. 1 ¶¶102-103, 108, 125).

charging documents made no mention of intoxication/incapacitation, despite that being the central issue in contention at the hearing. (Doc. 1 ¶¶ 103, 120).

As many courts have acknowledged, procedural defects, when combined with other allegations such as federal pressure to aggressively pursue sexual misconduct claims, are sufficient to support a Title IX claim. *Doe v. Baum*, 903 F.3d 575, 585-87 (6th Cir. 2018); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D. Va. 2018). *See also Doe v. Rensselaer Polytechnic Inst.*, 2020 WL 6118492, at *10 (N.D.N.Y. Oct. 16, 2020) (school's decision to apply old policy and preclude cross-examination supported finding that plaintiff was likely to succeed on his Title IX claim).[6]

With respect to institutional bias, looking again at the *Purdue* case, the Seventh Circuit found it compelling that the plaintiff identified a single social media

---

[6] The district court quoted from certain cases indicating that the railroading of a male respondent is not necessarily indicative of gender bias, because such conduct could also be consistent with non-gendered anti-*respondent* bias. (Doc. 25 p.16-17). However, "at [the motion to dismiss] stage, when there are two equally plausible ways to read a complaint, we should adopt the reading that is most favorable to [the plaintiff]." *Worthy*, 930 F.3d at 1214. "Sex discrimination need not be the *only* plausible explanation or even the most plausible explanation for a Title IX claim to proceed." *Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 579 (8th Cir. 2021) (citation omitted). Moreover, the Department of Education declared in September 2017 that "any school that uses a system biased toward finding a student responsible for sexual misconduct … **commits discrimination**." (Doc. 1 ¶ 45) (emphasis added). Thus, "where there is a one-sided investigation plus *some* evidence that sex *may have* played a role in a school's disciplinary decision, it should be up to a jury to determine whether the school's bias was based on a protected trait or merely a non-protected trait that breaks down across gender lines." *Doe v. Univ. of Denver*, 1 F.4th 822, 836 (10th Cir. 2021) (emphasis added).

post in which the university's Center for Advocacy, Response, and Education promoted an article titled "Alcohol isn't the cause of campus sexual assault. Men are." *Purdue*, 928 F.3d at 669. *See also Washington & Lee Univ.*, 2015 WL 4647996 at *10 (university official endorsed an article opining that sexual assault happens whenever a woman regrets a sexual encounter with a man). In the case at bar, Plaintiff alleges even more significant institutional bias, in the form of *years* of programming at Emory blaming men for sexual assault, presuming that women are victims, and presuming that female complainants are credible, leading up to and including the year in which Jane Roe reported Plaintiff. (Doc. 1 ¶¶ 70-73).

Plaintiff also alleges public pressure on Emory to aggressively pursue sexual assault claims brought by women against men, including a five-year investigation by OCR that was ongoing at the time of Jane Roe's initial report. (Doc. 1 ¶¶ 18-25, 32-38, 54-55, 68, 102). While courts have held that public pressure *standing alone* may not indicate sex bias, Plaintiff here does not allege public pressure standing alone; as set forth above, he alleges public pressure along with substantive and procedural irregularities and institutional bias that collectively raise an inference of sex bias. This is sufficient to put Plaintiff's Complaint over the plausibility line. *See Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (public pressure "provides a backdrop that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim."); *Doe v. Purdue Univ.*, 928 F.3d

652, 668 (7th Cir. 2019) (an unsupportable disciplinary decision, combined with allegations about the DCL and two OCR investigations at Purdue, plausibly alleged gender bias); *Doe v. Columbia Univ.,* 831 F.3d 46, 58 (2d Cir. 2016).[7]

In light of the above, taking the factual allegations in the Complaint as true and reading them in the light most favorable to Plaintiff, the Complaint alleges sufficient factual matter to create a plausible inference that Emory discriminated against him on the basis of sex. The Complaint contains precisely the type of allegations which have been found sufficient to state a Title IX claim by courts across the country, including cases cited by this Court in *Samford*.

### D. The District Court Erred in Dismissing Plaintiff's Title-IX Claim

The district court's conclusion that Plaintiff failed to plausibly allege gender bias resulted from the court's failure to presume the factual allegations as true and grant all inferences in Plaintiff's favor. Throughout the district court's decision, the court ignored, misread, or failed to meaningfully grapple with the allegations in Plaintiff's complaint, instead block-quoting from other cases and then simply

---

[7] In *Samford*, this Court found the plaintiff's allegations about the Dear Colleague Letter and related federal pressure to be essentially moot, because the policy that controlled his disciplinary process was drafted to comply with the revised 2020 Title IX regulations, *after* the DCL was revoked. 29 F.4th at 691-92. Here, in contrast, Emory adjudicated Plaintiff's case under the policy it had previously devised to comply with the DCL, *not* its newer policy. (Doc. 1 ¶¶ 54-57, 121-123).

declaring that Plaintiff's allegations didn't pass muster, without accurate or meaningful analysis.

For example, the district court relied on cases stating that certain types of allegations *standing alone* do not suffice to show gender bias, but then failed to acknowledge that Plaintiff's allegations did *not* stand alone.[8] Similarly, the district court held that allegations of federal pressure were insufficient "absent university-specific allegations" (Doc. 25 p.19), but failed to acknowledge the Complaint *does* allege university-specific allegations: Emory was under a five-year investigation by OCR. (Doc. 1 ¶¶ 35-36).

At other points, the district court failed to acknowledge case law supporting Plaintiff's claims in addition to failing to accept or acknowledge Plaintiff's factual allegations. For example, the court concluded that Plaintiff's allegations of "evidentiary irregularities" "failed to raise a reasonable inference of gender bias" without actually discussing the evidentiary issues separate from the procedural irregularities, (Doc. 25 p.13-17), and without acknowledging that evidentiary issues *can* be grave enough to imply gender bias, even standing alone. *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020); *Samford*, 29 F.4th at 697-98. The district court

---

[8] *See* Doc. 25 p.16 (stating procedural errors "standing alone" may not show bias) and p.19 (stating public pressure on university "without more" may not show bias), but failing to square this with the fact that Plaintiff alleged both (Doc. 1 ¶¶ 18-25, 32-38, 54-55, 68, 102-104, 109-135).

also ruled certain of Plaintiff's allegations to be impermissible legal conclusions without factual support, even though the court *quoted the supporting factual content*. For example, the district court disregarded as "conclusory" Plaintiff's allegation that "prejudicial" material was included in the investigation report, even though the court quoted the very content it claimed was missing: allegations that the report called Plaintiff "the biggest stoner at Emory" and that many girls were "scared of" him. (Doc. 25 p.13-14; Doc. 1 ¶ 118).

The district court's errors contravene well-settled law mandating a liberal reading of complaints and requiring only basic, notice-pleading that *plausibly* states a claim; the order dismissing Plaintiff's Title IX claim should be reversed.

## II.    <u>Plaintiff's Complaint Plausibly Alleges Breach of Contract</u>[9]

Plaintiff's Complaint plausibly alleges a contractual relationship between himself and Emory, breach of the contract terms, and damages. (Doc. 1 ¶¶ 136, 138, 140-156, 176-178). In the case at bar, the district court disregarded well-established precedent, purported to rely on cases that actually *supported* the sufficiency of Plaintiff's claims, and applied an overly-narrow, inaccurate reading of the

---

[9] The Complaint alleged breach of contract (Doc. 1 ¶¶ 175-180) and "intentional and knowing" breach of contract (Doc. 1 ¶¶ 181-188). The district court questioned whether the latter count constitutes a separate cause of action, but ultimately did not reach the issue, dismissing the second claim on the grounds that Plaintiff failed to sufficiently allege a contract. (Doc. 25 p.30).

Complaint. The district court's order dismissing Plaintiff's breach of contract claims should be reversed.

> A. <u>The Precedent Is Clear: Private Colleges and Universities Have a Contractual Relationship with Their Students</u>

In Georgia, there are three essential elements for breach of contract: (1) a valid contract, (2) a material breach of the contract's terms, and (3) damages resulting from the breach. *Brooks v. Branch Banking & Tr. Co.*, 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015). In evaluating a motion to dismiss a breach of contract claim, "the Court undertakes no substantive inquiry regarding the existence or effect of a contract, but rather whether the pleadings merely allege one." *Doe v. Emory Univ.*, 2021 WL 358391, at *3 (N.D. Ga. Jan. 22, 2021). Questions about the sufficiency of mutual assent are "inapposite at this stage of the litigation," as they go to the merits of the claim, not the adequacy of the pleading. *Id.* at *5.

A breach of contract claim may be based on an express *or* implied contract (or both). *Williams v. Corp. of Mercer Univ.*, 542 F. Supp. 3d 1366, 1376 (M.D. Ga. 2021). Implied contracts "arise from nonverbal conduct of the parties." *Davidson v. Maraj*, 609 F. App'x 994, 999 (11th Cir. 2015). "**Georgia law permits an expelled student to bring a breach of contract action against a private educational institution for failure to abide by the hearing procedures set forth in the student handbook**." *Kuritzky v. Emory Univ.*, 294 Ga. App. 370, 371, 669 S.E.2d 179, 181 (2008) (emphasis added); *see also Morehouse Coll., Inc. v. McGaha*, 277 Ga. App.

529, 531, 627 S.E.2d 39, 41 (2005). This is because "[i]t is well established that the student-university relationship is essentially contractual in nature," and the terms of the contract are provided by the university's published policies and procedures. *Williams*, 542 F. Supp. 3d at 1375; *see also Pinder v. John Marshall Law School, LLC*, 11 F. Supp. 3d 1208, 1266 (N.D. Ga. 2014).

Courts have repeatedly affirmed that Emory students, specifically, may sue Emory under breach of contract for failure to abide by its published procedures, bulletins, and course catalogue. *See Kuritzky v. Emory Univ.*, 294 Ga. App. 370, 370, 669 S.E.2d 179, 181 (2008); *Doe v. Emory Univ.*, 2021 WL 358391, at *6 (N.D. Ga. Jan. 22, 2021); *Jane Doe v. Emory University, Inc.,* 2022 WL 17419555, at *8 (N.D. Ga. Dec. 5, 2022) (Emory's Sexual Misconduct Policy provided enforceable contract terms). Notably, in each of these Emory cases, allegations that a student paid tuition, attended classes/pursued their degree, Emory published and disseminated specific policies/course descriptions, and Emory did not comply with those published policies/course descriptions, were deemed sufficient to assert a breach of contract claim.

B. Plaintiff Adequately and Plausibly Alleges a Contractual Relationship with Emory

Plaintiff's Complaint alleges that during the relevant time period, "a contractual relationship existed between Plaintiff and Emory through Emory's

40

dissemination of the policies and procedures governing the student disciplinary system, including but not limited to the [Sexual Misconduct] Policy, and Plaintiff's tuition payments and other considerations, such as compliance with the University's relevant policies." (Doc. 1 ¶ 176). The Complaint specifically identifies the Sexual Misconduct Policy—which Emory published and disseminated, applied to Plaintiff's disciplinary matter, and formed the basis for Emory's suspension of Plaintiff—as providing the key contract terms, and identifies expressly which terms were breached and how. (Doc. 1 ¶¶ 102, 120, 134, 136, 138, 140, 142-148, 176-178). The Complaint also alleges that these contractual violations resulted in his improper finding and suspension, causing him concrete harm. (Doc. 1 ¶¶ 149-156).

Thus, the Complaint plausibly alleges a breach of contract claim under an implied contract theory. *See Williams*, 542 F. Supp. 3d at 1377 ("[T]he Parties' previous course of dealings of providing on-campus services and facilities in exchange the payment of tuition and fees could plausibly give rise to an implied contract under Georgia law."); *Doe v. Emory Univ.*, 2021 WL 358391, at *6 (N.D. Ga. Jan. 22, 2021) **("[Emory]'s customary practice and the Plaintiffs' payment of tuition represent sufficient factual allegations of mutual assent to an implied contract.**" (emphasis added)); *Jane Doe v. Emory University, Inc.,* 2022 WL 17419555, at *8 (N.D. Ga. Dec. 5, 2022) ("[I]f a university's policies guarantee

certain hearing procedures in a disciplinary proceeding, then a student may sue in contract if she is denied access to those procedures.").

C. The District Court Erred in Dismissing Plaintiff's Breach of Contract Claims

The district court erred in dismissing Plaintiff's breach of contract claims by disregarding applicable precedent, ignoring the well-pleaded fact allegations in the Complaint, reading the Complaint in an overly-narrow way in the light least favorable to Plaintiff, and purporting to rely on cases that actually supported the sufficiency of Plaintiff's Complaint.

"[A]t [the motion to dismiss] stage, when there are two equally plausible ways to read a complaint, we should adopt the reading that is most favorable to [the plaintiff]." *Worthy v. City of Phenix, Ala.,* 930 F.3d 1206, 1214 (11th Cir. 2019). In *Williams v. Corporation of Mercer University*, the middle district of Georgia noted that "Plaintiff's first count is labeled 'breach of contract,' and the factual allegations suggest that Plaintiff desires to proceed on both a theory of express contract and a theory of implied contract." 542 F. Supp. 3d at 1376. Thus, consistent with this Court's mandate on motions to dismiss, the *Williams* court properly "construe[d] Plaintiff's allegations as claims under both theories", ultimately finding the contractual allegations to be sufficient. *Id.* at 1376-77.

The district court here did the exact opposite of what this Court has expressly directed (and what Georgia courts typically do in this scenario): although the

Complaint did not specify that Plaintiff's contract claim was based exclusively on an express contract,[10] the district court summarily interpreted the Complaint as such, and then dismissed the allegations as insufficient to establish an express contract. (Doc. 25 pp.26-29). This is a patent error of law. The district court's failure to consider whether Plaintiff set forth a plausible claim for breach of implied contract is particularly troubling considering that the very case the district court cited as "instructive" in resolving Plaintiff's claims, did exactly that. (Doc. 25 p.27).

Specifically, the district court quoted from a portion of Judge Thrash's decision in *Doe v. Emory Univ.*, 2021 WL 358391 (N.D. Ga. Jan. 22, 2021), holding that allegations of tuition payments alone are insufficient to allege mutual assent to an express contract (Doc. 25 pp.27-28). However, the district court *ignored the remainder of that decision*, wherein Judge Thrash went on to hold that **a student's payment of tuition *did* suffice to allege an implied contract**. *Doe v. Emory Univ.*, 2021 WL 358391 at *6.

If any doubt remained over the sufficiency of Plaintiff's claims against Emory here, Judge Thrash's subsequent decision in another Emory case—involving Emory's alleged failure to comply with its Sexual Misconduct policy—makes it

---

[10] To the contrary, the Complaint alleged that Emory "breached express *and implied agreements* with Plaintiff." (Doc. 1 ¶ 9) (emphasis added).

abundantly clear that the allegations in this Complaint are sufficient to state a

contract claim:

> According to the Amended Complaint, beginning in 2018, the Plaintiff formed a contract with the University by 'paying tuition and fees; participating in [the University's] education programs and activities; complying with [the University's] codes of conduct; and completing coursework at [the University's] Law School in pursuit of her J.D. degree.' She points to specific policies and procedures—from the SMP, Title IX, and the Clery Act—that were incorporated into that contract and breached by the University in handling her and John Doe's complaints. For example, the Plaintiff asserts that the University committed at least 11 violations of the SMP, including refusing to grant her requests for reasonable accommodations and failing to provide adequate notice of the complaints and charges against her. **These allegations are sufficient to survive a motion to dismiss**.

*Jane Doe v. Emory University, Inc.,* 2022 WL 17419555, at *8 (N.D. Ga. Dec. 5,

2022) (emphasis added) (citations omitted).

In addition to blatantly disregarding the case law, the district court below

incredibly claimed that Plaintiff failed to allege he had knowledge of the Sexual

Misconduct Policy (Doc. 25 pp.28-29), despite numerous allegations to the contrary.

The Complaint alleges that Emory disseminated the Policy and Plaintiff complied

with the Policy, from which a reasonable—if not obvious—inference follows that

Plaintiff was aware of the Policy. (Doc. 1 ¶¶ 136, 138, 176). The Complaint also

describes Plaintiff's disputes with Emory over its insistence on applying an older

version of the Policy to his disciplinary matter, rather than the version created to

comply with the 2020 Title IX regulations, clearly indicating that Plaintiff was aware of the Policy.  (Doc. 1 ¶¶ 116, 120-123).

The district court's order dismissing Plaintiff's contract claims was wrong on the facts and the law, violated the court's obligations to Plaintiff on a motion to dismiss, and should be reversed.

**III.    <u>The District Court Improperly Dismissed Plaintiff's First Complaint with Prejudice</u>**

The district court erred as a matter of law and abused its discretion in dismissing Plaintiff's Complaint with prejudice in the first instance and denying Plaintiff an opportunity to amend. The district court made no finding that amendment would be futile, yet flatly disregarded Plaintiff's request for an opportunity to cure on the basis of a purported technical deficiency, elevating form over function and failing to heed Supreme Court and Eleventh Circuit precedent.

A. <u>Eleventh Circuit Precedent Disfavors Dismissals with Prejudice for Facial Insufficiency and Requires that Plaintiffs be Given at Least One Opportunity to Amend Before a Dismissal with Prejudice</u>

For over fifty years, this Circuit has disfavored dismissals with prejudice for facial insufficiency in the first instance: "[A] dismissal with prejudice on the basis of bare bones pleadings is a tortuous thing." *Shull v. Pilot Life Ins. Co.*, 313 F.2d 445, 447 (5th Cir. 1963) (citation and quotations omitted); *see also Boazman v.*

*Econ. Lab., Inc.*, 537 F.2d 210, 212 (5th Cir. 1976) ("[D]ismissal with prejudice is such a severe sanction that it is to be used only in extreme circumstances.").[11]

Because a Rule 12(b)(6) dismissal with prejudice bars the plaintiff from ever seeking relief, even for potentially meritorious claims, such an extreme sanction is to be avoided unless the plaintiff clearly does not wish to amend or the court finds that amendment would be futile. "If a complaint fails to state a claim and a more carefully drafted complaint might state a claim, a plaintiff **must** be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *Woldeab v. DeKalb Cnty. Bd. of Educ.*, 885 F.3d 1289, 1291 (11th Cir. 2018) (emphasis added) (citation and quotations omitted). "[T]he purpose of allowing amendments is to resolve litigation on the merits, and decisions based upon the merits generally are favored under the Rules." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 545 (11th Cir. 2002) (citing *Foman v. Davis,* 371 U.S. 178, 181–82 (1962)).

With respect to a district court's discretion to deny a plaintiff leave to amend a first complaint, the Supreme Court and this Circuit have "severely" circumscribed such discretion, requiring a "substantial" justification to dismiss a first complaint

---

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

with prejudice, such as futility or bad faith/misconduct by plaintiff. In *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988), this Court explained:

> [A] district court's discretion to dismiss a complaint without leave to amend is "severely restrict[ed]" by Fed. R. Civ. P. 15(a), which directs that leave to amend "shall be freely given when justice so requires." [U]nless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial.

(citation omitted). *See also Kalpakchian v. Bank of Am. Corp*., 832 Fed. Appx. 579, 586 (11th Cir. 2020) ("[B]ecause [plaintiff] 'might state a claim' against Wells Fargo for negligence, the district court abused its discretion by denying her a chance to amend that claim."); *Bowers v. U.S. Parole Comm'n, Warden*, 760 F.3d 1177, 1185 (11th Cir. 2014) ("District courts have limited discretion in denying leave to amend, and should grant a motion to amend '[u]nless there [are] substantial reason[s] to deny' it." (citation omitted)); *Thomas v. Farmville Mfg. Co., Inc.,* 705 F.2d 1307, 1307–08 (11th Cir. 1983) ("A grant of leave to amend is particularly appropriate following dismissal of a complaint for failure to state a claim[.]").

In 2002, this Circuit confirmed the limited discretion afforded to district courts in dismissing first complaints with prejudice, announcing a clear rule that, where a counseled plaintiff files a motion to amend or "request[s] leave to amend" in the district court, the district court must grant plaintiff an opportunity to amend. *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542-43 (11th Cir. 2002) (en banc).

In *Wagner*, this Court was reconsidering a prior rule requiring district courts to dismiss without prejudice even absent any indication from the plaintiff that they would like to (or could) amend the complaint. *Id.* at 543-44. The *Wagner* Court ultimately replaced the prior, no-exceptions rule, with a slightly modified version: a district court may dismiss a first complaint with prejudice only if a counseled plaintiff "never filed a motion to amend **nor requested leave to amend** before the district court." *Wagner*, 314 F.3d at 542 (emphasis added). Notably, the *Wagner* Court could have abandoned the prior rule altogether, rather than modifying it, and grant district courts unfettered discretion to dismiss a first complaint with prejudice, but it expressly elected not to, instead continuing the mandate for district courts to freely grant leave to amend as long as a plaintiff makes his desire for such opportunity known to the district court. *Wagner*, 314 F.3d at 542.

Of particular interest here was the *Wagner* Court's deliberate wording of the rule as requiring leave to amend as long as a plaintiff files a motion to amend *or* requests leave to amend; in other words, a formal motion with proposed amended pleading is *not* the exclusive method by which a plaintiff becomes entitled to an opportunity to cure. *Wagner*, 314 F.3d at 542. This is a sensible rule because it acknowledges that, while a motion to dismiss is still pending, the plaintiff is without the court's guidance as to what actual deficiencies, if any, may exist within the complaint. As the Eleventh Circuit has explained, a plaintiff is "not required to

48

accept the [defendant]'s argument in its motion to dismiss as true" and formally move to amend the complaint in accordance with an as-yet unadjudicated argument from his adversary. *Woldeab v. Dekalb Cnty. Bd. of Educ.*, 885 F.3d 1289, 1291 (11th Cir. 2018). *See also Santiago v. Wood*, 904 F.2d 673, 676 (11th Cir. 1990) (reversing dismissal, holding district court abused its discretion in denying leave to amend, where although defendant's argument for dismissal was made clear in the briefs, plaintiff did not have the benefit of the court's guidance until after the motion was decided).

To the extent the district court relied on certain cases indicating that a court may dismiss a complaint with prejudice where the plaintiff fails to submit a proposed amended pleading in response to a motion to dismiss, (Doc. 25 p.31), Plaintiff respectfully submits this line of case law is misplaced, and appears to have stemmed from a 1995 Florida district court decision that was functionally overruled by *Wagner* in 2002. *See Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009), citing to *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1222 (11th Cir. 1999), citing to *Kelly v. Kelly*, 901 F. Supp. 1567, 1570 (M.D. Fla. 1995). Moreover, in those cases, the plaintiffs either passively referenced a potential amendment or directly sought leave to amend within their briefs, whereas Plaintiff here requested leave *to file a motion to amend* with a proposed amended pleading (Doc. 20 pp.7, 25). Thus, to the extent this line of cases is even valid, it is not applicable here.

49

B. <u>The District Court Erred as a Matter of Law and Abused its Discretion in Denying Plaintiff an Opportunity to Amend the Complaint</u>

In Plaintiff's opposition to Emory's motion to dismiss, he set forth his belief that his Complaint was sufficient to state the claims alleged, but also expressly requested from the district court an opportunity to amend his complaint, through proper and formal motion practice, with the guidance of the court's decision, in the event the court was inclined to grant any portion of Emory's motion. (Doc. 20 pp.7, 25). In accordance with long-standing precedent in this jurisdiction, this was sufficient to preserve Plaintiff's right to a dismissal *without* prejudice and an opportunity to amend. *See Kalpakchian v. Bank of Am. Corp.,* 832 Fed. Appx. 579, 586 (11th Cir. 2020); *Woldeab v. DeKalb Cnty. Bd. of Educ*., 885 F.3d 1289, 1291 (11th Cir. 2018); *Rivas v. The Bank of New York Mellon*, 676 Fed. Appx. 926, 932 n.4 (11th Cir. 2017) ("The defendants argue that Rivas's failure to describe the substance of his proposed amended complaint required rejection of his request for leave to amend. We disagree."); *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002); *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988); *Thomas v. Farmville Mfg. Co., Inc.*, 705 F.2d 1307, 1307–08 (11th Cir. 1983); *Fowlkes v. American Health Associates, Inc.*, 1:20-CV-3646-AT, 2021 WL 9794788, at *5 (N.D. Ga. May 28, 2021) (permitting 30 days to file an amended pleading as to non-futile claims); *Doe v. Emory Univ.*, 1:20-CV-2002-TWT, 2021 WL 358391, at *6 (N.D. Ga. Jan. 22, 2021) ("[T]hese deficiencies [in the complaint]

50

are factual, not legal. Because the Court believes Plaintiff Doe could sufficiently plead a breach of express contract claim if she presented currently missing facts, this Court dismisses her breach of contract claim without prejudice."); *Cervantes v. Invesco Holding Co. (US), Inc.*, 1:18-CV-02551-AT, 2019 WL 5067202, at *6 (N.D. Ga. Sept. 25, 2019) ("In light of Plaintiff's request for leave to amend [in a footnote in plaintiff's opposition brief] and the possibility that 'a more carefully drafted complaint' could state a claim, the Court must give Plaintiff the opportunity to try."). *See also Teel v. Deloitte & Touche LLP*, 3:15-CV-2593-G, 2015 WL 9478187, at *10–11 (N.D. Tex. Dec. 29, 2015) ("[A] plaintiff's failure to seek an amendment as a matter of course does not prevent the plaintiff from being able to amend her complaint after the court dismisses the complaint for the first time under a Rule 12(b)(6) motion to dismiss.").

Despite the clear mandate to permit plaintiffs an opportunity to cure a deficient pleading at least once, the district court here flatly denied Plaintiff's request, improperly classifying Plaintiff's legal argument and request for leave *to file a motion to amend*, as a deficient motion to amend in and of itself. (Doc. 25 p.31). The district court made no analysis or finding that amendment would be futile—to the contrary, the district court's decision dismissing Plaintiff's claims largely turned on hyper-technical distinctions and word choices that almost certainly could be cured on amendment, such as the court's holding that Plaintiff's contract

claim failed because he purportedly did not allege he was "aware of" the Sexual Misconduct Policy.[12] (Doc. 25 pp.28-29). The district court's sole reasoning for dismissing Plaintiff's first Complaint with prejudice—that Plaintiff's request in his opposition brief failed to comply with the formal motion practice for amendment—is not a "substantial" justification to preclude a plaintiff with potentially meritorious claims from ever being able to seek relief.

In light of the long-standing precedent severely limiting district court discretion to dismiss first complaints with prejudice, and the mandate in the Federal Rules that leave to amend be "freely" given (Fed. R. Civ. P. 15), the district court abused its discretion, and erred as a matter of law, in dismissing Plaintiff's Complaint with prejudice in the first instance and denying him even a single opportunity to submit a proposed amended pleading. The district court's order dismissing Plaintiff's claims with prejudice should be reversed.

## CONCLUSION

Plaintiff-Appellant John Doe respectfully submits this Court should: (i) **reverse** the district court's order dismissing Plaintiff's Title IX claim; (ii) **reverse** the district court's order dismissing Plaintiff's breach of contract claims; (iii) **reverse** the district court's order dismissing Plaintiff's Complaint with prejudice; and (iv) **remand** this case to the district court for further proceedings.

---

[12] As discussed *supra*, Plaintiff did in fact allege this element.

Dated: January 9, 2023

                    **NESENOFF & MILTENBERG, LLP**

                    __/s *Adrienne Levy*____

                    Adrienne Levy, Esq.

                    363 Seventh Ave, 5th Floor

                    New York, NY 10001

                    Telephone: 212-736-4500

                    Facsimile:  212-736-2260

                    Alevy@nmllplaw.com

                         -and-

                    **PARKS, CHESIN, & WALBERT, P.C.**

                    __/s *Andrew Coffman*_____

                    Andrew Y. Coffman, Esq.

                    75 14th Street, 26th Floor

                    Atlanta, GA 30307

                    Telephone: 404-873-8000

                    Facsimile:  404-873-8050

                    acoffman@pcwlawfirm.com

                    *Counsel for Plaintiff-Appellant John Doe*

53

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This document complies with the type-volume word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by 11th Cir. R. 32-4, this document contains 12,660 words. I relied on my word processor, Microsoft Word (version 16.68), to obtain the count.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a typeface using serifs (Times New Roman) in 14-point font.

__/s *Adrienne Levy*____
Adrienne Levy, Esq.

54

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit through the Court's CM/ECF system.

I further certify that the participants in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

_/s *Adrienne Levy*____
Adrienne Levy, Esq.