## 22-13293

# United States Court of Appeals
### *for the*
# Eleventh Circuit

JOHN DOE,

*Plaintiff/Appellant,*

– v. –

EMORY UNIVERSITY,

*Defendant/Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
CASE NO: 1:21-cv-02763-MHC
(Hon. Mark Howard Cohen)

## APPELLANT'S REPLY BRIEF

ADRIENNE LEVY
NESENOFF & MILTONBERG, LLP
363 7th Avenue, 5th Floor
New York, New York 10001
(212) 736-4500

ANDREW Y. COFFMAN
PARKS CHESIN & WALBERT, PC
75 14th Street NE, 26th Floor
Atlanta, Georgia 30309
(404) 873-8000

*Counsel for Plaintiff/Appellant*

<u>No. 22-13293</u>
**John Doe v. Emory University**

<u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT</u>

Pursuant to 11th Cir. R. 26.1-1(a), the following is a complete, alphabetical list of all persons and entities known to have an interest in the outcome of this appeal:

- Bernstein, Stuart, *Counsel for John Doe*

- Bosin, Joshua I., *Counsel for John Doe*

- Boyd, Nicholas Robert, *Counsel for Emory*

- Coffman, Andrew Y., *Counsel for John Doe*

- Cohen, Hon. Mark H., *District Court Judge*

- Doe, John, *Plaintiff-Appellant*

- Emory University, *Defendant-Appellee*

- Gansert, MacKenzie Elizabeth, *Counsel for Emory University*

- Hamrick, John M., *Counsel for Emory University*

- Holland & Knight LLP, *Counsel for Emory University*

- Levy, Adrienne, *Counsel for John Doe*

- Lewis, Nicholas E., *Prior counsel for John Doe*

- Miltenberg, Andrew T., *Counsel for John Doe*

- Nesenoff & Miltenberg, LLP, *Counsel for John Doe*

- Parks, Chesin & Walbert, P.C., *Counsel for John Doe*

Plaintiff-Appellant John Doe is an individual and a natural person, to whom Rule 26.1 of the Federal Rules of Appellate Procedure does not apply.

No subsidiaries, conglomerates, affiliates, parent corporations, publicly held corporations owning 10% or more of any party's stock, or other identifiable legal entities relating to any party are known to Plaintiff-Appellant.


__ /s *Adrienne Levy*____
Adrienne Levy, Esq.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................... iii

ARGUMENT/REPLY ................................................................................... 1

I.    PLAINITFF PLAUSIBLY ALLEGES A TITLE IX CLAIM. ...................... 1

   A. This Case is Distinguishable from *Samford*. ............................. 1

      i.    Procedural Deviations. ..................................................... 2

      ii.   Questionable Outcome. .................................................... 3

      iii.  Federal Pressure/"Dear Colleague" Letter. ....................... 4

      iv.  Institutional Bias. ............................................................ 4

   B. Emory's "Obvious Alternative Explanations" Argument Functionally Sets a Heightened Pleading Standard in Title IX Cases. ................................. 5

II.   PLAINTIFF PLAUSIBLY ALLEGES BREACH OF CONTRACT. ......... 10

   A. Emory's Arguments Regarding Mutual Assent are Misleading and Misplaced. ........................................................................... 11

      i.   Emory's Reliance on Non-Rule 12 Cases is Unavailing. .................... 12

      ii.  Emory's Cases Support the Adequacy of Plaintiff's Complaint. ....... 13

      iii. Emory Fails to Meaningfully Distinguish this Case from Other Emory Cases. ..................................................................... 15

      iv. Emory's Remaining Cases are Inapposite. ........................ 16

   B. Plaintiff Is Not Seeking to Have the Court "Re-Write His Complaint. ... 19

   C. Emory's "Modification at Will" Argument Goes to the Merits of the Contract Claim, Not the Pleadings, and is Unconvincing in Any Case. 19

i

III. THE DISTRICT COURT ERRED BY DISMISSING PLAINTIFF'S FIRST COMPLAINT WITH PREJUDICE, DESPITE PLAINTIFF'S EXPRESS REQUEST FOR AN OPPORTUNITY TO CURE. ....................................22

CERTIFICATE OF COMPLIANCE ........................................................29

CERTIFICATE OF SERVICE..................................................................30

RULE 32.1 ADDENDUM .......................................................................31

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                          <u>Page(s)</u>

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................1, 6, 7, 8

*Bazemore v. Jefferson Capital Sys., LLC*,
   2015 WL 2220057 (S.D. Ga. May 11, 2015) .....................................12

*Bazemore v. Jefferson Capital Sys., LLC*,
   827 F.3d 1325 (11th Cir. 2016)...........................................................12

*BDI Laguna Holdings, Inc. v. Marsh*,
   301 Ga. App. 656 (2009)....................................................................12

*Bell Atl. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................passim

*Bishop v. Shorter Univ., Inc.*,
   2015 WL 13753710 (N.D. Ga. June 4, 2015) ....................................18

*Carter v. HSBC Mortgage Servs.*,
   Inc., 622 Fed. Appx. 783 (11th Cir. 2015) ........................................25

*Cita Trust Company AG v. Fifth Third Bank*,
   879 F.3d 1151 (11th Cir. 2018)..........................................................23

*Cox Broad. Corp. v. Nat'l Collegiate Athletic Ass'n*,
   250 Ga. 391 (1982).............................................................................12

*Davidson v. Maraj*,
   609 Fed. Appx. 994 (11th Cir. 2015) ................................................23

*Doe v. Emory Univ.*,
   2021 WL 358391 (N.D. Ga. Jan. 22, 2021) .................................13, 15

*Doe v. Oberlin Coll.*,
   963 F.3d 580 (6th Cir. 2020).................................................................4

*Doe v. Purdue Univ.*,
  928 F.3d 652 (7th Cir. 2019) ..................................................................2

*Doe v. Samford University*,
  29 F.4th 675 (11th Cir. 2022) ...........................................................passim

*Doe v. Washington & Lee Univ.*,
  2015 WL 4647996 (W.D. Va. Aug. 5, 2015) ................................20, 21

*Donaldson v. Olympic Health Spa, Inc.*,
  175 Ga. App. 258 (1985) .......................................................................12

*Foman v. Davis*,
  371 U.S. 178 (1962) .........................................................................22, 27

*Grange Mut. Cas. Co. v. Woodard*,
  797 S.E.2d 814 (Ga. 2017) ...................................................................13

*Henkel Corp. v. Leggett & Platt, Inc.*,
  2009 WL 2230813 (N.D. Ga. July 24, 2009) ........................................21

*Jackson v. Easters*,
  190 Ga. App. 713 (1989) .......................................................................12

*Jane Doe v. Emory University, Inc.*,
  2022 WL 17419555 (N.D. Ga. Dec. 5, 2022) ........................10, 15, 16

*Jansen v. Emory Univ.*,
  440 F. Supp. 1060 (N.D. Ga. 1977) ......................................................10

*Kemira, Inc. v. Williams Investigative & Sec. Servs., Inc.*,
  215 Ga. App. 194 (1994) .......................................................................20

*Kuritzky v. Emory Univ.*,
  294 Ga. App. 370 (2008) .......................................................................10

*Lambert v. Austin Ind.*,
  544 F.3d 1192 (11th Cir. 2008) ............................................................19

iv

*Lee v. Univ. of New Mexico*,
   449 F. Supp. 3d 1071 (D.N.M. 2020)....................................................17

*Manago v. D.C.*,
   934 A.2d 925 (D.C. 2007)....................................................................17

*Mathews v. Clark Atlanta Univ., Inc.*,
   1:17-CV-2963-MLB, 2023 WL 2229670 (N.D. Ga. Jan. 13, 2023)............13, 14

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) .............................................................................9

*Millien v. Colby Coll.*,
   874 A.2d 397 (Me. 2005) ...............................................................20, 21

*Morehouse Coll., Inc. v. McGaha*,
   627 S.E.2d 39 (Ga. Ct. App. 2005) ......................................................17

*Moreno v. Smith*,
   299 Ga. 443 (2016)..............................................................................13

*Mun. Elec. Auth. of Georgia v. City of Calhoun*,
   227 Ga. App. 571 (1997)......................................................................19

*Nungesser v. Columbia Univ.*,
   169 F. Supp. 3d 353 (S.D.N.Y. 2016) ..................................................14

*Posner v. Essex Ins. Co., Ltd.*,
   178 F.3d 1209 (11th Cir. 1999).................................................23, 24, 25

*Rosenberg v. Gould*,
   554 F.3d 962 (11th Cir. 2009).........................................................5, 25

*Rossi v. Univ. of Utah*,
   2021 UT 43, 496 P.3d 105 (Utah 2021) ................................................13

*Shaw v. Elon Univ.*,
   400 F. Supp. 3d 360 (M.D.N.C. 2019)..................................................16

*Simmons v. McBride*,
  228 Ga. App. 752 (1997) ....................................................12

*Smith v. Healthcare Auth. for Baptist Health*,
  2022 WL 857036 (M.D. Ala. Mar. 22, 2022) ......................8

*Swierkiewicz v. Sorema N. A.*,
  534 U.S. 506 (2002) ......................................................5, 8

*Thomas v. Town of Davie*,
  847 F.2d 771 (11th Cir. 1988) ..........................................22

*Tims v. LGE Cmty. Credit Union*,
  935 F.3d 1228 (11th Cir. 2019) ........................................18

*Wagner v. Daewoo Heavy Indus. Am. Corp.*,
  314 F.3d 541 (11th Cir. 2002) ............................23, 24, 25

*Williams v. Corp. of Mercer Univ.*,
  542 F. Supp. 3d 1366 (M.D. Ga. 2021) ............................19

*Worthy v. City of Phenix, Ala.*,
  930 F.3d 1206, 1214 (11th Cir. 2019) ................................9

*Wright v. Southland Corp.*,
  187 F.3d 1287, n.5 (11th Cir. 1999) ..................................9

## **Rules**

F.R.A.P. 32.1(b) ....................................................................14

F.R.C.P. 12(b)(6) ........................................................... Passim

**ARGUMENT/REPLY**

## I.  **PLAINITFF PLAUSIBLY ALLEGES A TITLE IX CLAIM.**

Plaintiff's Complaint alleges sufficient facts to state a plausible Title IX claim under *Twombly/Iqbal*.[1] Plaintiff alleges: (i) Emory was financially motivated to find male students responsible for sexual misconduct; (ii) Emory promoted the notion that men are sexual assailants and women are victims; (iii) Emory violated its own procedures throughout Plaintiff's Title IX case and treated the female student(s) more favorably; (iv) Emory's decision in favor of the female student was gravely erroneous and against the weight of the evidence; and (v) Emory employees handling Plaintiff's Title IX hearing indicated, through both conduct and overt statements, that they presumed the female student(s) credible from the start and the male student(s) guilty/not credible. (Appellant Br. 30-38).[2]  At the pleading stage, this is sufficient to state a plausible claim for gender bias.

### A.      **This Case is Distinguishable from Samford.**

Emory argues that *Doe v. Samford University*, 29 F.4th 675 (11th Cir. 2022) mandates a dismissal here. (Appellee Br. 21-23).[3] However, this case is materially distinguishable from *Samford*.

---

[1] *Bell Atl. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).
[2] 11th Cir. Dkt. 19-1. To maintain consistency with Emory's brief, all page citations to the parties' briefs to this Court refer to the page numbers at the foot of the page.
[3] 11th Cir. Dkt. 28.

1

### *i.*   *Procedural Deviations.*

In *Samford*, the plaintiff alleged the investigator's report contained "prejudicial" and "inflammatory" content, but did not factually describe the content, leading this Court to disregard the allegations as conclusory. *Id.* at 688. Here, Plaintiff's allegations of a prejudicial report *do* specify the factual content. Doc. 1 ¶118. In *Samford*, the plaintiff also alleged the university ignored evidence he submitted on appeal, but this Court found he failed to allege the evidence was unavailable prior to appeal, which the relevant policy required. 29 F.4th at 688. In other words, the plaintiff failed to allege a violation. Here, Plaintiff alleges numerous procedural irregularities/violations, including the hearing panel's failure to properly apply the Policy definitions of consent and incapacitation, their presumption that the male student was guilty/not credible, and their disparate treatment of Plaintiff versus the female accuser. (Doc. 1 ¶¶102-104, 109-135, 142-148).

In *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019), the district court credited the plaintiff's allegation that one of the hearing panel members "asked [him] accusatory questions that assumed his guilt," and considered this as indicating gender bias: "It is plausible that [defendants] chose to believe Jane because she is a woman and to disbelieve John because he is a man." *Purdue*, 928 F.3d at 669. Here, Plaintiff similarly alleges hostile treatment by the hearing panel that presumed his guilt, and disparate treatment of the male versus female students regarding

credibility determinations. Doc. 1 ¶¶124-133. This case is more akin to *Purdue* than *Samford*.

### ii.    *Questionable Outcome.*

In *Samford*, this Court found the university's determination was not unsupportable, because even though the complainant initially claimed incapacitation by drugs, and later claimed incapacitation by alcohol, the essence of her claim— incapacitation—never waivered, and witnesses testified she was "passed out." 29 F.4th at 690-91. Here, by contrast, Jane Roe's allegations took a 180-degree turnaround from her initial complaint and interview (stating she was sober, "not incoherent—very aware," and was forcibly assaulted by being choked with a belt) to the hearing (claiming she was severely intoxicated/incapacitated and was not choked). There are no allegations that Jane Roe passed out or otherwise exhibited signs of incapacitation. (Doc. 1 ¶¶102-103, 108, 125, 133).

Emory argues the outcome here is supportable because the hearing panel was *aware* of Jane Roe's incompatible claims yet decided in her favor anyway. (Appellee Br. 27-29). But this calls for the opposite conclusion that Emory proposes. The fact that decision-makers were presented with two opposing versions of events from Jane Roe, yet refused to ask her questions that would damage her credibility or acknowledge that there were inconsistencies at all, indicates a gravely erroneous decision indicative of gender bias. Doc. 1 ¶¶125-133; *Doe v. Oberlin Coll.*, 963 F.3d

580, 586–88 (6th Cir. 2020) (hearing panel's failure to acknowledge discrepancies in accuser's claims, and decision based on intoxication rather than incapacitation, was "grave" error implying gender bias).

### iii. Federal Pressure/"Dear Colleague" Letter.

In *Samford*, this Court held that allegations regarding the 2011 Dear Colleague Letter (DCL) did not support an inference of gender bias, because that plaintiff's case was adjudicated under the school's 2020-compliant Title IX policy, after the rescission of the DCL. 29 F.4th at 691-92. Here, in contrast, Emory refused to adjudicate Plaintiff's case under its revised, 2020-compliant policy, and instead applied a Policy that was written to comply with the DCL under the threat of losing federal funds. Doc. 1 ¶¶54-57,121-123. Further, the *Samford* plaintiff did not allege any university-specific Title IX enforcement actions, whereas Plaintiff here alleges Emory was just wrapping up a five-year OCR investigation when Jane Roe filed her complaint against Plaintiff. That very investigation was publicly announced at the height of the Department of Education's enforcement activity regarding the DCL and related guidance. Doc. 1 ¶35-37.

### iv. Institutional Bias.

In *Samford*, this Court found allegations regarding university comments about the importance of supporting "complainants" to be gender-neutral. 29 F.4th at 691. In this case, Plaintiff alleges years of programming at Emory specifically reinforcing

the notion that men are rapists and rape is a "masculinity" issue—a far cry from the kind of gender-neutral messaging at issue in *Samford*. Doc. 1 ¶¶69-74.

Thus, *Samford* does not mandate dismissal here.

**B.      Emory's "Obvious Alternative Explanations" Argument Functionally Sets a Heightened Pleading Standard in Title IX Cases.**

Emory argues the Complaint was properly dismissed because the procedural, evidentiary, and federal pressure/institutional-bias allegations in the Complaint could *hypothetically* be explained by non-gendered motives, such as "ineptitude" and "pro-complainant bias." (Appellee Br. 19-20).  While this Court did employ an "obvious alternative explanations" approach in *Samford*, Plaintiff respectfully submits that an unrestrained application of this approach in Title IX cases would functionally impose a probability requirement at the pleading stage and an impermissibly heightened pleading standard. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002) (heightened pleading requirements are set by amending the Federal Rules, not by "judicial interpretation"); *see also Rosenberg v. Gould*, 554 F.3d 962, 965 (11th Cir. 2009) (describing the need to allege evidence of unlawful intent that is "at least as compelling as any opposing inference" as a **heightened pleading standard**).

A review of the origins of the "obvious alternative explanations" approach is instructive. In *Twombly*, the Supreme Court held that allegations of parallel *lawful*

conduct among telecom businesses, standing alone, failed to state a claim for conspiracy to unlawfully prevent competition. *Twombly*, 550 U.S. at 565-67. The Court held that allegations of lawful conduct merely "consistent with" a cause of action, fall short of the plausibility line in the face of an "obvious alternative explanation." *Id.* at 568. There, the "obvious alternative explanation" was the decade-plus of lawful telecom monopolies and the absence of alleged facts indicating that continued non-competition wasn't a profitable or valid business decision. *Ibid.* Essentially, the plaintiff merely alleged the continued status-quo in telecom noncompetition that had existed lawfully for many years, failing to raise a plausible inference of unlawful coordination.

In *Iqbal*, the Supreme Court applied the "obvious alternative explanations" concept in evaluating a qualified immunity argument in a discrimination case. There, the plaintiff alleged he was detained on an immigration charge (to which he pleaded guilty), and that he and other Arab Muslims detained in connection with the 9/11 terrorist attacks were subjected to particularly restrictive incarceration. *Iqbal*, 556 U.S. at 681–83. The plaintiff alleged this restrictive incarceration was the result of a discriminatory policy created by the defendants. *Ibid.* The *Iqbal* Court concluded that, given the 9/11 attacks were committed primarily by Arab Muslims, it was unsurprising that individuals arrested for ties to the attacks would be

disproportionately Arab and Muslim – thus, an "obvious alternative explanation" to the discriminatory policy hypothesized by the plaintiff. *Id.* at 681–82.

Crucially, the plaintiff in *Iqbal* was not merely alleging religious discrimination, but rather, that defendants crafted an official *policy* of discrimination, which had "no legitimate penological interest." *Id.* at 662, 677. Thus, to defeat the qualified immunity claim, plaintiff had to allege facts sufficient to show the existence of a *policy*, calling for heightened incarceration based *exclusively* on religion/national origin, with *no* legitimate basis. *Ibid.* That is a significantly higher bar than a standard Title IX claim, which only requires acts of discrimination, not a formal policy. *See id.* at 682-83 (even plausible allegations of discriminatory treatment were insufficient to overcome qualified immunity for defendants who were not personally involved in plaintiff's arrest/incarceration).

Most importantly, the facts in *Twombly* and *Iqbal* were held to be consistent with entirely "neutral", lawful behavior, explainable by documented facts/history specifically identified by the Court in each case. *Twombly*, 550 U.S. at 567-58; *Iqbal*, 556 U.S. at 682-83. Thus, the "obvious alternative explanations" approach must be closely restricted to the limited, unique context from which it came: allegations of entirely neutral, lawful conduct, standing alone, with a documented, "obvious" explanation so clear as to render the possibility of unlawful conduct implausible.

Such is not the case here. Plaintiff alleges substantial, one-sided, improper conduct, and there is no neutral, factually-established, "obvious alternative explanation" to Emory's conduct that is "so compelling as to render the inference [of discrimination] implausible." *Smith v. Healthcare Auth. for Baptist Health*, 2022 WL 857036, at \*4 (M.D. Ala. Mar. 22, 2022). Instead, Emory simply posits that there are *conceivable* alternative explanations for its misconduct, such as "ineptitude."[4]  But this supposition alone does nothing to render the inference of gender bias implausible. Furthermore, "pro-complainant/anti-respondent" bias does not fit into the *Twombly/Iqbal* framework of neutral and lawful alternative explanations, because according to the Department of Education and Emory's own Policy, pro-complainant/anti-respondent bias is *not* a permissible, neutral basis upon which to rest a Title IX disciplinary decision.  *See* Doc. 1 ¶ 45; Doc. 15-2, pp.16,18-19 (repeatedly promising "equitable" and "impartial" proceedings).

As the concurrence in *Samford* intimated, an unrestrained application of the "obvious alternative explanations" approach in discrimination cases functionally moves the substantive determination of pretext to the pleading stage, which is improper. *Doe v. Samford Univ.*, 29 F.4th 675, 695–96 (11th Cir. 2022) (Jordan, J.,

---

[4] In *Samford*, the university appeal board acknowledged procedural defects in its proceedings and blamed them on an inexperienced investigator and issues transitioning to a new policy. 29 F.4th at 689. There are no allegations here that Emory acknowledged its procedural defects, nor provided a rational, non-discriminatory explanation therefor.

Concurring); *see also Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511-12 (2002) (elements of a prima facie case "should not be transposed into a rigid pleading standard."); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803–04 (1973) (pretext is an evidentiary/substantive issue).

In discrimination cases specifically, where there is unlikely to be direct, "smoking-gun" evidence and the defendant's state of mind is key,[5] an overly-loose application of the "obvious alternative explanations" approach creates a situation ripe for mistakes and abuse, in which the court summarily decides, on the pleadings, what the defendant's subjective motivations were.[6] While framing this determination as one of "facial plausibility", the reality is that this weighing of hypothetical motives equates to a probability requirement at the pleading stage, which the Supreme Court has expressly prohibited. *Twombly*, 550 U.S. at 556.

"[W]hen there are two equally plausible ways to read a complaint, we should adopt the reading that is most favorable to [the plaintiff]." *Worthy v. City of Phenix*,

---

[5] *See generally*, *Wright v. Southland Corp.*, 187 F.3d 1287, 1290–92, n.5 (11th Cir. 1999) (noting difficulty of proving defendant's state of mind and discussing burden-shifting rule established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[6] This concern is heightened when the judge has a personal connection to the defendant that could impact his/her assessment, whether consciously/intentionally or not.  For example, the district judge below earned both his degrees from Emory, taught courses at Emory, and spent years on a committee devoted to promoting/fundraising for Emory. *See* https://www.judiciary.senate.gov/imo/media/doc/Mark-Cohen-Senate-Questionnaire-Final.pdf.

*Ala.*, 930 F.3d 1206, 1214 (11th Cir. 2019).  In the instant case, there is nothing inherently more plausible about Emory acting with incompetence as opposed to discriminatory intent. Plaintiff's Title IX claim should be reinstated.

## II.  PLAINTIFF PLAUSIBLY ALLEGES BREACH OF CONTRACT.

As Georgia courts have recognized for over forty years, a student's relationship with their school is contractual in nature, with the terms of said contract "expressed in the bulletins and catalogue of the University." *Jansen v. Emory Univ.*, 440 F. Supp. 1060, 1062 (N.D. Ga. 1977), *aff'd*, 579 F.2d 45 (5th Cir. 1978);[7] *Kuritzky v. Emory Univ.*, 294 Ga. App. 370, 371 (2008); *Jane Doe v. Emory University, Inc.,* 2022 WL 17419555, at *8 (N.D. Ga. Dec. 5, 2022).  Consistent with this well-established principle, Plaintiff alleges: (i) Emory disseminated and enforced compliance with the Sexual Misconduct Policy; (ii) Plaintiff was aware of the Policy and assented to its terms by paying tuition, pursuing his degree, and complying with the Policy, and (iii) Emory made express, specific promises within the Policy, which it breached, resulting in damages. Doc. 1 ¶¶77-79, 121, 136, 138, 140-156, 176-178). Plaintiff's Complaint sufficiently alleges breach of contract. (Appellant's Br. 38-45).

---

[7] While the court ultimately found no breach in *Jansen*, it accepted that Emory's relevant policy document provided enforceable contract terms. *Id.* at 1062.

10

In opposition, Emory proffers inaccurate claims about the Complaint, inapposite cases, and substantive arguments about the merits of the contract claim, none of which support dismissal of Plaintiff's contract claims under Rule 12(b)(6).

### A.      **Emory's Arguments Regarding Mutual Assent are Misleading and Misplaced.**

Emory's claims that Plaintiff failed to allege his assent to the Policy (Appellee Br. 37-40), are unconvincing and incorrect. First, Emory repeats the district court's faulty conclusion that Plaintiff did not allege "awareness" of the Policy, ignoring Plaintiff's allegations that he discussed the Policy with Emory. (Doc. 1 ¶¶120-123). Second, Emory argues that Plaintiff's allegations of compliance with the Policy should be disregarded as "conclusory," because Plaintiff "does not identify any act that he took to comply with the Policy." (Appellee Br. 42). But this goes to *proof* of compliance, which is not the purpose of a Rule 12(b)(6) motion. Contrary to Emory's argument, Plaintiff is not required to "establish" mutual assent on the pleadings, he need only allege it. The Complaint adequately alleges Plaintiff's knowledge of and compliance with the Policy, both specifically and generally. *See* Doc. 1 ¶ 119 (submitted response to investigative report), ¶¶ 123-124 (participated in hearing pursuant to SMP), ¶ 176 (alleging "compliance" with the SMP); *see also* Doc. 15-2, pp.18-21 (setting forth procedures with which Plaintiff's alleged facts demonstrate compliance).

### i.    *Emory's Reliance on Non-Rule 12 Cases is Unavailing.*

Emory relies heavily on cases deciding the *merits* of various contract claims, none of which address the adequacy of the pleadings. (Appellee's Br. 37-48).   If anything, the fact that these cases proceeded to merits determinations undercuts Emory's claim that the allegations were insufficient to state a claim in the first place.[8]

For example, *Simmons v. McBride*, 228 Ga. App. 752 (1997), was an appeal from a hearing on the merits, wherein the trial court found, after taking evidence and testimony, that plaintiff failed to *prove* mutual assent. *BDI Laguna Holdings, Inc. v. Marsh*, 301 Ga. App. 656 (2009) was an appeal from a jury verdict.  *Bazemore v. Jefferson Capital Sys., LLC,* 827 F.3d 1325 (11th Cir. 2016) involved a motion to compel arbitration, applying a summary judgment standard to evidence and testimony. *See Bazemore v. Jefferson Capital Sys., LLC*, 2015 WL 2220057 (S.D. Ga. May 11, 2015).  *Donaldson v. Olympic Health Spa, Inc.*, 175 Ga. App. 258 (1985) was an appeal from a directed verdict, "[c]onsidering the evidence adduced" at trial, not the pleadings. *Id.* at 259.  *Cox Broad. Corp. v. Nat'l Collegiate Athletic Ass'n*, 250 Ga. 391 (1982), and *Jackson v. Easters*, 190 Ga. App. 713 (1989) involved a motion for injunctive relief and a jury verdict, respectively. *Grange Mut.*

---

[8] Although Plaintiff is the Appellant here, "[u]nder Rule 12(b)(6), the burden of demonstrating that no claim has been stated is upon the movant." *Bendiburg v. Dempsey*, 692 F. Supp. 1354, 1360 (N.D. Ga. 1988) (citing *Jackam v. HCA Mideast, Ltd.*, 800 F.2d 1577 (11th Cir. 1986)).

*Cas. Co. v. Woodard*, 797 S.E.2d 814 (Ga. 2017) was a summary judgment decision pertaining to settlement agreements and automobile insurance. None of these cases addressed pleading standards for student-university breach of contract claims.

*Rossi v. Univ. of Utah*, 2021 UT 43, 496 P.3d 105 (Utah 2021) was an out-of-state appeal from summary judgment, wherein the policy sought to be enforced "expressly state[d] it 'is not a contract between the University of Utah and any person or entity.'" *Id.* at 114. In contrast, Emory's Sexual Misconduct Policy contains no such disclaimer. (Doc. 15-2, pp.16-28).

### ii. Emory's Cases Support the Adequacy of Plaintiff's Complaint.

Some of Emory's cited cases actually support the sufficiency of Plaintiff's Complaint. In *Moreno v. Smith*, 299 Ga. 443 (2016), the Georgia appellate court reversed the trial court's grant of summary judgment, holding "the question of whether a party has assented to the contract is generally a matter for the jury." *Id.* at 445. *See also Doe v. Emory Univ.*, 2021 WL 358391, at *3-*5 (N.D. Ga. Jan. 22, 2021) (disputes over sufficiency of mutual assent are "inapposite at this stage of the litigation.").

Emory cites *Mathews v. Clark Atlanta Univ., Inc.*, 1:17-CV-2963-MLB, 2023 WL 2229670 (N.D. Ga. Jan. 13, 2023) for the proposition that a student cannot rely on university policy documents to make out a contract claim (Appellee Br. 41);

13

however, the *Matthews* court *upheld* the plaintiff's breach of contract claims based on university policy documents against a Rule 12 motion:

> The complaint pleads twenty-three instances in which Defendant allegedly violated its code of conduct. These allegations give rise to a plausible breach of contract claim. **Plaintiff has identified specific provisions of the Student Handbook that Defendant purportedly breached and facts alleging how the breach occurred. That is sufficient at the motion to dismiss stage**.

*Mathews v. Clark Atlanta Univ., Inc.*, 1:17-CV-2963-MLB, Doc. No. 74 at *34 (emphasis added) (citations omitted).[9]

Similarly, Emory cites *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353 (S.D.N.Y. 2016), for the proposition that "broad and unspecified procedures" cannot ground a contract claim (Appellee Br. 39), but the *Nungesser* court stated:

> When a student is admitted to a university, an implied contract arises between the parties which states that if the student complies with the terms prescribed by the university, he will obtain the degree he seeks. **The rights and obligations of the parties as contained in the university's bulletins, circulars and regulations made available to the student, become a part of this contract**.

*Id.* at 369-370 (emphasis added) (citations omitted). The *Nungesser* court went on to hold that specific provisions in a university policy, such as those relating to notice, *are* enforceable under contract. *Id.* at 370.  Plaintiff here alleges numerous specific provisions breached by Emory, including those relating to notice, definitions of

---

[9] Pursuant to F.R.A.P. 32.1(b), a copy of this decision is annexed to this brief.

consent and incapacitation, and the conduct of the hearing itself. (Doc. 1 ¶¶ 142-148).

>    iii.    **Emory Fails to Meaningfully Distinguish this Case from Other Emory Cases.**

Addressing two cases cited in Plaintiff's opening brief, in which the Northern District of Georgia twice held that student-plaintiffs plausibly stated a claim for breach of implied contract against Emory for failing to abide by its policies (Appellant's Br. 42-44), Emory makes two unconvincing attempts at distinction.

First, Emory claims that *Doe v. Emory Univ.*, 2021 WL 358391 (N.D. Ga. Jan. 22, 2021), does not apply here because Plaintiff has not alleged a "prior course of dealings." (Appellee Br. 44). This is untrue. The Complaint plausibly alleges that each year, Emory disseminated the SMP, which it used to adjudicate Title IX matters, and each year, Plaintiff paid tuition and complied with the Policy. The Title IX matter at issue here came about during Plaintiff's second year, and in fact, Emory itself was adamant that the SMP controlled the proceedings. Thus, Plaintiff alleges a course of conduct indicating mutual assent to the Policy. Doc. 1 ¶¶77, 102, 120-124,136-137, 176.

Moreover, in *Jane Doe v. Emory University, Inc.*, 2022 WL 17419555 (N.D. Ga. Dec. 5, 2022), the district court upheld the plaintiff's implied contract claims against Emory based on its failure to comply with the SMP, solely on allegations that plaintiff paid tuition, pursued her education, and complied with the Policy. *Id.*

at *8.  There was no requirement that the plaintiff allege a previous experience going through the Title IX/SMP process at Emory, as Emory purports to be necessary here. (Appellee Br. 45).  Emory further posits that the *Jane Doe* case is distinguishable, because that plaintiff also alleged a promise to "comply with Title IX." (Appellee Br. 45).  However, Emory provides no explanation for how or why this additional allegation would affect the sufficiency of Plaintiff's contract claim involving the Sexual Misconduct Policy—and for good reason: it doesn't.

### iv.    Emory's Remaining Cases are Inapposite.

Emory relies on *Shaw v. Elon Univ.*, 400 F. Supp. 3d 360 (M.D.N.C. 2019), for the proposition that Plaintiff "has not alleged the implied contractual relationship incorporated [Emory]'s undertakings set forth in the [relevant Policy]." (Appellee Br. 42).    Yet the Complaint does precisely that.  *See* Doc. 1 ¶ 136 ("Plaintiff and Emory became mutually bound by the [Sexual Misconduct Policy], which is the applicable policy for Emory's Title IX procedures.").  Moreover, according to *Shaw*, "most North Carolina lower courts and federal courts . . . have found that university handbooks, bulletins, guidelines, codes of conduct, manuals, and the like are not independently enforceable contracts." *Id.* at 365.  This stands in stark contrast to Georgia law, which consistently recognizes that university bulletins, handbooks, and policies can indeed be enforceable contracts. *Morehouse Coll., Inc.*

16

*v. McGaha*, 627 S.E.2d 39, 42 (Ga. Ct. App. 2005).[10] In addition, the provisions at issue in *Shaw* contained permissive and indefinite language, whereas the provisions at issue here are specific and mandatory. *See, e.g.*, Doc. 1 ¶¶ 142 ("The Title IX Coordinator for Students **will ensure** prompt, fair, and impartial investigations"), ¶ 143 ("the Title IX Coordinator for Students **will keep the parties apprised** of the status of their case"), ¶ 145 ("a written 'Notice of Charges of Policy Violation' ('Notice of Charges') **will be provided** to the Respondent . . . with summary information that supports the charge(s)").

*Manago v. D.C.*, 934 A.2d 925 (D.C. 2007), also cited by Emory, was decided primarily on the grounds that the plaintiff failed to allege a proper defendant for her contract claim. *Id.* at 927. The *Manago* court recognized "the general rule that the relationship between a university and its students is contractual in nature" and that a student-plaintiff may ground a contract claim on a school policy, but simply noted the plaintiff in that case had not actually identified any policy terms or alleged breaches. *Ibid.* Here, Plaintiff does identify specific Policy provisions and how Emory breached them. Doc. 1 ¶¶ 141-148.

---

[10] Emory also seeks to paint *Shaw* as the majority view of "courts around the country," (Appellee Br. 42), but as one district court has noted, *Shaw* actually represents a minority view, of "limited reasoning." *Lee v. Univ. of New Mexico*, 449 F. Supp. 3d 1071, 1147 (D.N.M. 2020).

Emory's reliance on *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228 (11th Cir. 2019), fails for two reasons. First, the defendant in *Tims* conceded the existence of the contract; the dispute was solely as to the interpretation of a specific term. *Id.* at 1237. Second, on appeal, this Court overturned the trial court's order dismissing the contract claim, holding that the interpretation of an ambiguous contract term was a fact question for the jury. *Id.* at 1237-43.

Emory also finds no help from *Bishop v. Shorter Univ., Inc.*, 2015 WL 13753710 (N.D. Ga. June 4, 2015). In that case, the plaintiffs sought to hold their university accountable for a data breach committed by a third party, relying on university website posts addressing the confidentiality of student medical information. The district court dismissed the claims in part because "nowhere in the complaint [were] the Plaintiffs alleged to have ever logged onto [Defendant's] website and accessed, read, understood, actually relied upon, or otherwise considered [Defendant's] privacy policy." *Id.* at *7. In contrast, Plaintiff here does allege that he accessed, was aware of the Policy, and gave consideration in the form of tuition, pursuit of his education, and compliance with the Policy. (Doc. 1 ¶¶ 77, 116, 121, 176). Additionally, the plaintiffs in *Bishop* sought to hold the university accountable under breach of contract for the criminal acts of a third-party; here, Plaintiff seeks to hold Emory accountable for its own non-compliance with its Policy.

18

**B.**     **Plaintiff Is Not Seeking to Have the Court "Re-Write His Complaint.**

Emory claims that Plaintiff is impermissibly seeking to have this Court "re-write" his Complaint by citing Georgia law on implied contracts. (Appellee Br. 43). Plaintiff's Complaint lists a cause of action for "breach of contract" and alleges "Defendant breached express and implied agreements with Plaintiff." Doc. 1 ¶¶ 9, 175-188. There is nothing in the Complaint that needs "re-writing" for the court to consider the claims under an implied contract theory. *See Williams v. Corp. of Mercer Univ.*, 542 F. Supp. 3d 1366, 1376-77 (M.D. Ga. 2021).

**C.**     **Emory's "Modification at Will" Argument Goes to the Merits of the Contract Claim, Not the Pleadings, and is Unconvincing in Any Case.**

Emory argues it could amend the Sexual Misconduct Policy at will, rendering it unenforceable, mandating dismissal here. (Appellee Br. 46-48). However, this argument goes to the merits of the claim, not the facial sufficiency of the pleadings. Indeed, Emory again relies heavily on summary judgment and other merits-based decisions, which do not reflect Rule 12(b)(6) standards.

For example, *Mun. Elec. Auth. of Georgia v. City of Calhoun,* 227 Ga. App. 571 (1997), was an appeal after a two-week bench trial. The Georgia statute cited in that case, OCGA § 13–1–1, comprises Georgia's canons of contract interpretation, which address the substance of a contract claim. *Lambert v. Austin Ind.*, 544 F.3d 1192 (11th Cir. 2008) was an appeal from a motion to compel arbitration – another

19

determination on the merits. And in that case, this Court reversed the lower court and held the contract enforceable despite the seemingly optional and one-sided nature of the promises. *Id.* at 1195-1196.

Emory cites *Kemira, Inc. v. Williams Investigative & Sec. Servs., Inc.*, 215 Ga. App. 194 (1994)—an appeal from a jury verdict—for the proposition that a promise "entirely optional with the promisor" is unenforceable. (Appellee Br. 47). However, nothing in Emory's SMP indicates the procedures therein are "entirely optional"; to the contrary, the Policy is replete with mandatory language and contains no disclaimers. *See, e.g.,* Doc. 15-2, p.19 ("a hearing **will be** conducted as outlined in Section 8.2.3 (Hearing Procedures) of this Policy.").

For this same reason, Emory's citation to two out-of-jurisdiction cases addressing disclaimer language also fails. In *Millien v. Colby Coll.*, 874 A.2d 397, 400 (Me. 2005), an appeal following trial, the court noted that the policy relied upon by the plaintiff contained an *explicit* disclaimer as to any contractual obligations:

> NOTICE: The reader should take notice that while every effort is made to ensure the accuracy of the information provided herein[,] Colby College reserves the right to make changes at any time without prior notice. The College provides the information herein solely for the convenience of the reader and, to the extent permissible by law, expressly disclaims any liability which may otherwise be incurred.

*Id.* at 400 n.1.

20

Similarly, in *Doe v. Washington & Lee Univ.*, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015), the student handbook specifically stated: "This Student Handbook is not a contract." *Id.* at *11. Emory's Sexual Misconduct Policy contains no disclaimer language at all, let alone the type of clear, unambiguous disclaimers at issue in *Millien* and *Washington & Lee*. (Doc. 15-2, pp.16-28).[11]

Emory appears to hang its entire "illusory promise" argument on a single allegation in the Complaint that Emory updates the SMP each school year, and one page in the Policy itself purportedly showing previous revision dates. (Appellee Br. 47). Yet, nothing about an alleged yearly revision establishes that Emory may *unilaterally* change or abandon entirely its performance of the

---

[11] In the district court briefs, Emory attempted to make a disclaimer argument based upon an entirely separate, unrelated university policy not at issue in this case nor referenced anywhere in the Complaint. (Doc. 15-1, pp.22-24; Doc. 15-2, pp.2-15). Plaintiff objected to the submission of this unrelated policy as improper on a Rule 12 motion (Doc. 20, p.29 n.4). Emory appears to have, wisely, abandoned its argument concerning the unrelated policy on appeal to this Court. (Appellee Br. 46-48). However, in the event this Court decides to address the argument anyway, Plaintiff (i) continues his objection to the consideration of external documents not referenced nor relied upon in the Complaint, and (ii) submits that the "Code of Conduct" policy cannot possibly "incorporate by reference" the SMP. First, the Code of Conduct contained a single, passing mention of the existence of the SMP (Doc. 15-2, p.4); it did not purport in any way to incorporate the SMP by reference, let alone unambiguously so, as is required under Georgia law. *See Henkel Corp. v. Leggett & Platt, Inc.*, 2009 WL 2230813, at *2 (N.D. Ga. July 24, 2009). Second, the Code of Conduct prescribes an entirely different set of procedures and definitions than the SMP, which would eviscerate the SMP if it were "incorporated by reference" into the Code of Conduct. *Compare* Doc. 15-2, pp.6-9 *with* Doc. 15-2 pp.18-22. Third, the section of the Code of Conduct titled "related links," contains no link to the SMP (Doc. 15-2 p.15).

substantive provisions of the Policy without notice, mid-school year (or even mid-process, for a case that goes on for more than one school year). Instead, the Complaint merely indicates that each year, Emory issues an SMP, and each year, Plaintiff accepts the SMP by paying tuition and complying with the Policy.

Emory's argument about the revision dates in the SMP likewise fails to move the needle: a review of those revisions appears to show they are largely just updates to relevant employee names and contact information. At least one of the revisions states it was "based on community feedback", indicating a *non*-unilateral process, and the document appears to show no material changes were made during the time period at issue in this litigation (Doc. 15-2, p.28).

Plaintiff's contract claims should be reinstated.

## III. THE DISTRICT COURT ERRED BY DISMISSING PLAINTIFF'S FIRST COMPLAINT WITH PREJUDICE, DESPITE PLAINTIFF'S EXPRESS REQUEST FOR AN OPPORTUNITY TO CURE.

The district court erred as a matter of law and abused its discretion by dismissing Plaintiff's Complaint with prejudice, despite Plaintiff's express request for the opportunity to file a motion to amend with a proposed amended pleading. (Appellant Br. 21, 45-52). Emory's response brief disregards binding Supreme Court and Eleventh Circuit precedent severely limiting the discretion with which a district court may dismiss a first complaint with prejudice, absent a finding of bad faith, undue delay, or similar circumstances. *Foman v. Davis*, 371 U.S. 178, 182 (1962);

*Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988) (requiring a "substantial" basis to deny leave to amend). Emory also misconstrues the nature and impact of Plaintiff's request to the district court, cites to distinguishable cases in the questionably-valid *Posner/Rosenberg*[12] progeny, and posits that Plaintiff misinterprets *Wagner*[13] without providing a supportable alternative interpretation. (Appellee Br. 49-54). Emory's arguments are unavailing.

Emory relies heavily on *Cita Trust Company AG v. Fifth Third Bank*, 879 F.3d 1151 (11th Cir. 2018), and *Davidson v. Maraj*, 609 Fed. Appx. 994 (11th Cir. 2015), for the proposition that a district court does not abuse its discretion in dismissing a first complaint with prejudice where a formal motion to amend and proposed amended pleading were not filed below. (Appellee Br. 49-51). However, in both of those cases, the district court made a finding that amendment would be futile. *Cita*, 879 F.3d at 1154-55, 1157 (claim was time-barred); *Davidson*, 609 Fed. Appx. at 997 (plaintiff amended his complaint previously and remaining defects could not be cured). No such determination was made by the district court here.

Further, Emory argues that (i) *Wagner* did not functionally overrule *Posner*, because only a decision of this Court *en banc* can do so (Appellee Br. 51 n.6); and

---

[12] *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209 (11th Cir. 1999); *Rosenberg v. Gould,* 554 F.3d 962 (11th Cir. 2009).
[13] *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541 (11th Cir. 2002) (en banc).

23

(ii) *Wagner* did not "*expand* the circumstances in which a represented plaintiff is entitled to amend his complaint or suggest[] that a motion for leave to amend or request for leave to do so much be granted." (Appellee Br. 52). Emory is mistaken on both points.

First, *Wagner* **is** an *en banc* opinion of this Court, so it absolutely can (and Plaintiff submits, did) overrule *Posner* to the extent they're incompatible. Second, Emory's argument that *Wagner* did not "expand" plaintiffs' right to amend, turns the *Wagner* decision on its head. Prior to *Wagner*, the rule in this Circuit was that a district court had to give plaintiffs at least one opportunity to amend the complaint before dismissing with prejudice, *even when the plaintiff did not indicate any desire, ability, or intention to amend*. *Wagner*, 314 F.3d at 543-44. The *Wagner* court carved out a limited exception to the mandatory-dismissal-without-prejudice-in-all-cases rule: where a counseled plaintiff does not move *or request an opportunity* to amend his complaint, a district court may dismiss a first complaint with prejudice. *Id.* at 542. This limited exception to the prior rule heeded the mandate of Rule 15 that leave to amend be "freely granted", while balancing this right against the judicial inefficiency of permitting plaintiffs with no ability or intention to amend, to prolong litigation that was ultimately futile.

Thus, Emory's argument that *Wagner* did not "expand" plaintiffs' right to amend, is nonsensical, because the right was already as broad as it could possibly be

24

prior to the *Wagner* holding.  What *Wagner* did was constrict the previously unlimited right to a first dismissal without prejudice, holding that where a counseled plaintiff gives no indication that they would or could amend the complaint, it may be acceptable for a district court to dismiss with prejudice. *Id.* at 542. Here, Plaintiff did request leave to file a motion to amend; thus, the *Wagner* exception does not apply and the district court was obligated to give Plaintiff at least one opportunity to cure.

In addition to the questionable continued validity of the *Posner/Rosenberg* line of cases (in light of *Wagner*), there is a bigger-picture problem with Emory's proffered rule that a plaintiff's request for an opportunity to amend, included in an opposition brief to a *first* motion to dismiss, is insufficient to preserve the right to a dismissal without prejudice (or even a conditional dismissal with prejudice): it effectively punishes plaintiffs for not blindly accepting the arguments of their adversaries, without the benefit of judicial guidance.  And, the punishment is not merely a penalty or delay, but the most severe prejudice a plaintiff can face: a total bar to recovery.  The position advanced by Emory would only encourage plaintiffs to file their complaints *pro se*, because counseled plaintiffs apparently only have a single opportunity to plead their complaints perfectly before the court weighs in, whereas pro se plaintiffs are guaranteed at least one chance to re-plead after the court has ruled on a motion to dismiss. *See generally*, *Carter v. HSBC Mortgage Servs.*,

25

Inc., 622 Fed. Appx. 783, 786 (11th Cir. 2015) (*Wagner* limitation not applicable to pro se plaintiffs). Respectfully, this Court should not condone a rule that discourages counseled litigation and summarily bars plaintiffs from seeking relief based solely on inartful pleading in the first instance.

In light of the above, Emory's argument that the wording of Plaintiff's request to the district court is irrelevant (Appellee Br. 54-55), could not be more wrong. Plaintiff here did not request, via footnote, leave to directly file an as-yet-unpresented, untested amended complaint; rather, he sought an *opportunity* to file a proper motion to amend with a proposed amended pleading, after receiving the benefit of the court's view on the Rule 12 motion. (Doc. 20 pp.12, 30). All the district court had to do was issue a conditional dismissal with prejudice, giving the plaintiff some amount of time *after* the court specified what (if any) deficiencies needed curing, to submit a proposed amended pleading with all the proper formalities of motion practice. Instead, the district court—by declaring that Plaintiff's request did not meet the requirements of motion practice—essentially punished Plaintiff for not doing the very thing that Plaintiff *sought leave to do*. (Doc. 25 p.31).

The district court's dismissal with prejudice here is made even more egregious by the absence of any futility determination. To the contrary, parts of the court's ruling—like the conclusion that plaintiff failed to plead a contract claim because he

26

purportedly did not allege "knowledge" of the Policy—could easily be cured via amendment.

Again, Plaintiff is not advocating a rule that would require courts to permit amended pleadings sight-unseen, based solely on a footnote in opposition papers; he is solely arguing that plaintiffs should be given a chance to *submit* a proposed amended pleading after the court decides a Rule 12(b)(6) motion to dismiss a first complaint. Denying a good-faith plaintiff even a single opportunity to address potential deficiencies in his pleading is manifestly unjust and inconsistent with Supreme Court guidance requiring a "substantial" basis for such denials. *Foman*, 371 U.S. at 182. The district court's dismissal of Plaintiff's Complaint with prejudice should be reversed.

Dated: May 5, 2023

**NESENOFF & MILTENBERG, LLP**
__/s *Adrienne Levy*____
Adrienne Levy, Esq.
363 Seventh Ave, 5th Floor
New York, NY 10001
Telephone: 212-736-4500
Facsimile: 212-736-2260
Alevy@nmllplaw.com

-and-

27

**PARKS, CHESIN, & WALBERT, P.C.**
__/s *Andrew Coffman*_____
Andrew Y. Coffman, Esq.
75 14th Street, 26th Floor
Atlanta, GA 30307
Telephone: 404-873-8000
Facsimile:  404-873-8050
acoffman@pcwlawfirm.com

*Counsel for Plaintiff-Appellant John Doe*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This document complies with the type-volume word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by 11th Cir. R. 32-4, this document contains 6,360 words. I relied on my word processor, Microsoft Word (version 16.68), to obtain the count.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a typeface using serifs (Times New Roman) in 14-point font.

__/s *Adrienne Levy*____
Adrienne Levy, Esq.

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit through the Court's CM/ECF system.

I further certify that the participants in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

___/s *Adrienne Levy*____

Adrienne Levy, Esq.

## RULE 32.1 ADDENDUM

Pursuant to Federal Rule of Appellate Procedure 32.1(b), enclosed herewith is a true and correct copy of the February 23, 2021 decision of the United States District Court for the Northern District of Georgia, in *Mathews v. Clark Atlanta Univ., Inc.*, 1:17-CV-2963-MLB (Doc. No. 74).

    __/s *Adrienne Levy*____
    Adrienne Levy, Esq.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

Tayler Mathews,

          Plaintiff,

                    Case No. 1:17-cv-2963-MLB

v.

Clark Atlanta University, Inc.,

          Defendant.

_____/

## ORDER

Plaintiff Tayler Mathews was a student and employee at Defendant Clark Atlanta University, Inc.  She claims Defendant created a sexually hostile environment and then retaliated against her when she complained about it.  Defendant moves to dismiss. (Dkt. 58.)  The Court grants in part and denies in part that motion.  Plaintiff moves for oral argument. (Dkt. 63.)  The Court denies that motion as moot.

## I.    Background

From late 2013 until May 2020, Plaintiff was enrolled in Defendant's doctorate program in the Department of Political Science ("Department") and employed by Defendant in various graduate

assistant positions. (Dkt. 55 ¶ 8.) During this time, Plaintiff alleges she "faced an environment permeated by discrimination based on sex and gender, particularly within the Department." (*Id.* ¶ 9.) Specifically, "[f]aculty, almost all of whom were male, frequently sexually harassed women students, including Plaintiff, and were continually and openly derogatory towards women." (*Id.*) Male students, with encouragement from professors, also mocked women and made derogatory comments about women. (*Id.* ¶ 12.) Plaintiff alleges one student in particular, Bobby Rice-Bey, sexually harassed her. (*Id.* ¶ 14.) He continually "bombard[ed] her with text messages at all hours . . . with comments about her appearance, requests for dates, and other aggressive, unwelcome sexual advances." (*Id.*) He also initiated inappropriate conversations with Plaintiff when she participated in class and took nonconsensual photographs and videos of Plaintiff. (*Id.* ¶¶ 17–18.) His behavior continued to escalate to the point where "he grabbed her without her consent in an overtly sexual manner [and] refused to allow her to move." (*Id.* ¶¶ 20, 22.) As a result of his actions, Plaintiff claims she stopped participating in class and would shake, was unable to speak,

and felt sick when he looked at her. (*Id.* ¶¶ 17, 20.) Plaintiff rebuffed his advances but to no avail. (*Id.* ¶¶ 19, 21.)

On December 4, 2013, Plaintiff reported his conduct to the Department. (*Id.* ¶ 26.) Plaintiff alleges one faculty member, Kurt Young, demanded proof that Rice-Bey knew his advances were unwelcome, instructed her to sit on the other side of the classroom, and said he would speak to Rice-Bey. (*Id.*) Plaintiff also claims the Department's Administrative Assistant, Gwen Donaway, blamed Plaintiff for wearing leggings, told her that the unwelcome sexual advances were just "part of being a woman," and advised her to "cuss Rice-Bey out and carry a gun." (*Id.* ¶ 27 (alteration adopted).) She says no one informed her of her rights under Defendant's internal policies or the law. (*Id.*)

Plaintiff found Rice-Bey's sexual harassment to be particularly distressing in the Department seminar, a weekly assembly for graduate students with guest speakers. (*Id.* ¶ 29.) Because Rice-Bey continued taking photographs and videos of her, leering at her, and attempting to touch her and communicate with her, Plaintiff began missing the seminar in fall 2014. (*Id.* ¶ 30.) She discussed the problem with Young,

who "told her to reposition herself in the classroom to hide from Rice-Bey's camera," "threatened to lower Plaintiff's grade for no longer participating in class," and "blamed her for 'giving away her power.'" (*Id.* ¶¶ 30–31 (alterations adopted).)   In spring 2015, Plaintiff stopped attending the seminar altogether "to avoid further stalking and sexual harassment." (*Id.* ¶ 32.)

On November 4, 2014, Plaintiff submitted a Title IX complaint to Defendant's Associate Dean of Students Ernest Moore and Title IX Coordinator Ramona Roman. (*Id.* ¶ 34.)[1] Her complaint addressed three topics: (1) Rice-Bey's sexual harassment, (2) the Department's failure to inform other Defendant officials of her complaints or take corrective measures, and (3) Defendant's failure to issue Title IX-compliant sexual misconduct policies. (*Id.* ¶ 35.)  On November 11, 2014, Moore informed Plaintiff that Rice-Bey had been notified of her complaint and told not to contact Plaintiff. (*Id.* ¶ 37.)  He also promised Rice-Bey would be required to complete sexual harassment training. (*Id.*)

---

[1] Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

4

Roman later informed Plaintiff she had two options for resolving her Title IX complaint: a disciplinary conference or a hearing. (*Id.* ¶ 38.) Plaintiff alleges Roman pressured her to choose the disciplinary conference option by "asserting that a hearing would take longer, necessitate disclosure of private information to more people, and require Plaintiff to undergo direct cross-examination from Rice-Bey." (*Id.*) Based on these representations, Plaintiff chose the disciplinary conference "to avoid further trauma." (*Id.*) Plaintiff claims, however, that Roman pursued neither option. (*Id.* ¶ 39.) Instead, Roman "prioritized speed and convenience over following [Defendant's] disciplinary procedures or meeting [Defendant's] legal obligation." (*Id.* ¶ 40.) Plaintiff also alleges Roman, Moore, Defendant's Dean of Students Ernita Hemmitt, and other administrators refused to consider information they knew could be material and easily accessible. (*Id.* ¶ 41.) For example, Plaintiff never got the opportunity to call the five to seven witnesses she wanted to call, and Moore, who interviewed Rice-Bey alone, may have had additional information that was never provided to Roman. (*Id.*) Plaintiff says Roman interviewed no other witnesses and considered no statements from anyone other than Plaintiff and Rice-Bey. (*Id.* ¶ 42.)

On December 9, 2014, Hemmitt sent Rice-Bey a notice of outcome, stating Defendant found "insufficient evidence to substantiate Plaintiff's charges." (*Id.* (alteration adopted).) Hemmitt did not say the case was permanently closed but rather promised that, if new evidence came to light, it would be considered. (*Id.*) Finally, Hemmitt put a No Contact Order ("NCO") in place against both Plaintiff and Rice-Bey. (*Id.* ¶ 43.) Hemmitt stated that the NCO was a "sanction" and a violation of it "could lead to more serious sanctions up to and including suspension or expulsion." (*Id.*) Plaintiff alleges she never received a copy of the December 9, 2014 letter at the time and Defendant never notified her of Roman's findings or the NCO sanction. (*Id.* ¶ 44.) She says Defendant made no effort to tell her about its consideration of her complaint. (*Id.*)

In fact, Plaintiff believed Roman was still investigating her complaint until she met with Young on March 31, 2015. (*Id.* ¶ 46.) During that meeting, Young informed Plaintiff that he would not prioritize her applications for assistantships or funding because she had not been attending the seminar. (*Id.*) Plaintiff reminded him of her concerns about Rice-Bey and asked if she could complete an alternative assignment. (*Id.*) Young told Plaintiff that the Department had "no

6

obligation" to accommodate her because Defendant "had no findings" in her sexual harassment complaint and that Defendant's response to her Title IX complaint should be a "good learning experience" for when not to file sexual harassment complaints. (*Id.*) She says Young threatened her, saying her absences from the seminar might prevent her from graduating. Upset by that meeting, she decided to attend the seminar that evening but changed her mind when a friend told her Rice-Bey was there. (*Id.*)

On April 27, 2015, Plaintiff met with Moore to request a formal hearing on her Title IX complaints. (*Id.* ¶ 56.) During that meeting, Moore disclosed that, in 2014, he and Roman decided to resolve the matter without complying with Defendant's policies because they thought the complaints would "just go away" since Rice-Bey did not know where Plaintiff lived. (*Id.* ¶ 57.) On April 29, 2015, her request for a hearing was denied. (*Id.* ¶ 59.)

In April 2015, Rice-Bey began the process of submitting a counterclaim. (*Id.* ¶ 71.) Plaintiff alleges Defendant never notified her of Rice-Bey's counterclaim; instead, Defendant "took steps to hide the development from her until she discovered it in on [sic] her own during a

review of her education records on November 5, 2015." (*Id.*)  Plaintiff claims Defendant treated Rice-Bey more favorably by, for example, compiling substantial documentation and seeking out "every pertinent piece of information" for the investigation of his complaint.  (*Id.* ¶¶ 73– 74.)

On May 1, 2015, Plaintiff filed a complaint with the Office for Civil Rights ("OCR") of the U.S. Department of Education.  (*Id.* ¶ 75.)  She reported Defendant's failure to (1) respond promptly to or investigate thoroughly her sexual harassment reports; (2) explain or publicize its Title IX policies and grievance procedures; (3) notify her of her complaint's initial outcome; (4) accommodate her or remedy the hostile educational environment; and (5) train employees. (*Id.*)  On June 3, 2015, OCR issued Defendant a notice of investigation.  (*Id.*)  Plaintiff's OCR complaint is still ongoing.  (*Id.*)

In addition to the sexual harassment Plaintiff alleges to have suffered from Rice-Bey, she claims Professors Ledgister, Boone, Young, and Gibrill sexually harassed her.  (*Id.* ¶¶ 99, 112.)  On March 15, 2016, Plaintiff reported this harassment to Clark and Taylor.  (*Id.* ¶ 64.)  Taylor

replied, "There's nothing I can do."  (*Id.* ¶ 65.)  And Clark said, "I can't have this conversation."  (*Id.*)

Plaintiff also claims Defendant retaliated against her from November 2014 to May 2020.  (*Id.* ¶ 77.)  For example, Plaintiff asserts that Defendant cut funding for her doctoral studies each semester during that time, Young told her she needed to complete additional coursework than what was required of Ph.D. students, and faculty members limited their interactions with her.  (*Id.*)  She says Young and an adjunct instructor, Jasmine Younge, filed complaints against her for "furnishing false information to the university and defamation of character" in March 2016.  (*Id.* ¶ 78.)  Defendant held a disciplinary hearing on these complaints on July 14, 2016.  (*Id.* ¶ 80.)  Although the panel ultimately found Plaintiff "not responsible," Plaintiff alleges she was treated less favorably by, for example, having the burden of proof placed on her despite being the respondent.  (*Id.* ¶¶ 83–84.)  Students, some of whom were also Defendant's employees, retaliated against Plaintiff by socially ostracizing her, spreading rumors, and publicly denouncing her during meetings and in emails to the Department.  (*Id.* ¶ 87.)  According to Plaintiff, "despite receiving repeated actual notice of retaliation against

Plaintiff, [Defendant] failed even to investigate her retaliation complaints, let alone end, prevent, or remedy the effects of the retaliation." (*Id.* ¶¶ 88, 92.)

In her complaint, Plaintiff asserts claims against Defendant under Title IX for sexual harassment (Count I), retaliation (Count II), erroneous outcome (Count III), selective enforcement (Count IV), and gender-based hostile environment (Count V), and under state law for breach of contract (Count VI) and breach of the implied covenant of good faith and fair dealing (Count VII). (*Id.* at 36–90.) Defendant moves to dismiss the complaint in its entirety for two reasons: (1) Counts I through V are barred by the statute of limitations governing Title IX claims and (2) the complaint insufficiently pleads facts and cannot point to evidence supporting each of Plaintiff's claims. (Dkt. 58 at 8–22.) Defendant, in the alternative, argues that the complaint should be dismissed because it is an impermissible shotgun pleading. (*Id.* at 23.)

## II.   Standard of Review

In ruling on a motion to dismiss, the court must accept all well-pleaded facts as true and construe them in the light most favorable to the plaintiff. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1

(11th Cir. 1999). A complaint offering mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" is insufficient to state a claim and should be dismissed. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To survive a motion to dismiss, a complaint thus must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## III.   Discussion

### A.      Statute of Limitations

Plaintiff filed her initial complaint, which contains the same Title IX claims she alleges in her first amended complaint, on August 7, 2017. (Dkts. 1; 55.) Defendant argues Plaintiff's Title IX claims (Counts I through V) are barred by Georgia's two-year statute of limitations for personal injury actions because the facts and alleged injuries underlying each of Plaintiff's Title IX claims were known to Plaintiff more than two years before Plaintiff filed her complaint. (Dkt. 58 at 8.)

11

The Court agrees that Georgia's two-year statute of limitations governs.  When Congress creates a federal cause of action and fails to supply an express statute of limitations, "the 'most closely analogous' statute of limitations under state law governs the federal cause of action." *M.H.D. v. Westminster Schs.*, 172 F.3d 797, 803 (11th Cir. 1999) (citing *Reed v. United Transp. Union*, 488 U.S. 319, 323 (1989)).  According to the Eleventh Circuit, "a Title IX claim for damages is most closely analogous to a common law action for personal injury; therefore, the statute of limitations for personal injury controls." *Id.*  Georgia's statute of limitations for personal injury actions mandates that "actions for injuries to the person . . . be brought within two years after the right of action accrues." O.C.G.A. § 9-3-33.  "[U]nder Georgia law, the statute of limitations for an action accrues on the date when [a] plaintiff could have first brought a successful action against [a] defendant." *Williams v. Lear Operations Corp.*, 73 F. Supp. 2d 1377, 1380 n.3 (N.D. Ga. 1999) (citing Georgia cases).  In other words, the limitations period begins to run when a plaintiff's cause of action becomes "legally cognizable." *M.H.D.*, 172 F.3d at 804.  Having decided the two-year statute of limitations governs

Title IX claims, the Court turns to deciding whether Plaintiff's Title IX claims are time barred.

### 1.   Sexual Harassment Claims (Count I)

Although mashed together in a single count, Plaintiff actually brings two sexual harassment claims: one based on Rice-Bey's conduct and the other based on her professors' conduct. (Dkt. 55 ¶¶ 96, 99.) The core of Plaintiff's first claim is that Rice-Bey sexually harassed her, she reported it to Defendant, and Defendant responded with deliberate indifference. (*Id.* at 37.)

Plaintiff alleges Rice-Bey began sexually harassing her during the fall 2013 semester, and she reported his conduct to the Department in December 2013. (*Id.* ¶¶ 14, 26.) Defendant began responding—albeit poorly according to the complaint—that same month. (*Id.* ¶ 26.) Plaintiff thus likely had notice of a legally cognizable claim against Defendant as early as December 2013—more than three years before she filed her complaint. She certainly had notice of her claim by March 31, 2015 when she says Young told her Defendant had closed her complaint without any findings and that the outcome should be a "good learning experience" for when not to file sexual harassment complaints. She also certainly knew

by April 27, 2015 when Moore allegedly told her he and Roman had decided to resolve her complaint without following Defendant's policies and then denied her request for a hearing two days later.  But, drawing all reasonable inferences in Plaintiff's favor, she at least had notice of a legally cognizable claim by May 1, 2015 when she filed an OCR complaint, in which she reported, inter alia, Defendant's failure to "respond promptly to or investigate thoroughly her sexual harassment reports." (*Id.* ¶ 75.)  May 1, 2015 is still outside the two-year limitations period.  For this reason, Plaintiff's sexual harassment claim seeking to hold Defendant liable for its alleged deliberate indifference to Rice-Bey's conduct is barred.

Plaintiff argues the Court should apply the continuing violation doctrine to make her claim timely.  (Dkt. 59 at 2.)  Under that doctrine, a plaintiff can sue for actions that occurred outside the applicable limitations period if a defendant's conduct is part of a continuing practice and the last act evidencing the continuing practice falls within the limitations period.  *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006) (citing *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1221 (11th Cir. 2001)).  Courts must distinguish between the

14

continuing effects of a discrete violation and continuing violations: "The critical distinction in the continuing violation analysis . . . is whether the plaintiff[] complain[s] of 'the present consequence of a one-time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does.'" *Knight v. Columbus*, 19 F.3d 579, 580–81 (11th Cir. 1994) (quoting *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993)).

"The continuing violation doctrine is premised on 'the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated.'" *Hipp*, 252 F.3d at 1222 (quoting *Alldread v. City of Grenada*, 988 F.2d 1425, 1432 (5th Cir. 1993)). The doctrine does not exist to give a second chance to plaintiffs who allowed a legitimate claim to lapse. *Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 800 (11th Cir. 1988). Here, application of the continuing violation doctrine would not serve its purpose. According to the complaint, Defendant responded to Plaintiff's complaint regarding Rice-Bey outside the statute of limitations, and she was aware of its response outside of the statute of limitations. The fact that Plaintiff has

15

continued to feel the consequences of Defendant's prior conduct does not extend the limitations period.

Plaintiff's other sexual harassment claim seeks to hold Defendant liable for its alleged deliberate indifference to Professors Ledgister, Boone, Young, and Gibrill sexually harassing her. (Dkt. 55 ¶ 99.) She alleges she reported the professors' sexual harassment to "appropriate officials, including, but not limited to, Clark and Taylor, on March 15, 2016." (*Id.* ¶¶ 64, 99.) That date is the earliest Plaintiff could have had notice of a legally cognizable claim because Defendant cannot be deliberately indifferent to the professors' conduct if it did not know about the conduct until March 15, 2016.

## 2.   Retaliation Claim (Count II)

Plaintiff alleges Defendant took frequent and severe adverse actions against Plaintiff from November 2014 to May 2020 in response to her Title IX-protected activities. (*Id.* ¶ 119.) She claims she first notified Defendant of the retaliation in March 2015. (*Id.* ¶ 88.) Some of the retaliatory actions she alleges occurred more than two years before she filed suit. For example, Plaintiff claims after she filed a Title IX complaint in November 2014, Defendant officials spread rumors and

shared private information about Plaintiff beginning in November 2014 and cut Plaintiff's funding and denied her research and teaching assistantships beginning in January 2015.  (*Id.* ¶ 119.)  But she also alleges Defendant repeated these retaliatory actions well within the two-year limitations period, even until the spring 2020 semester.  (*Id.*) And she claims Defendant engaged in other forms of retaliation within the two-year limitations period.  (*See, e.g.*, *id.* ¶ 119(c) ("Young tried to change Plaintiff's degree requirements in November 2015."); ¶ 119(m) ("Gibrill rescinded his offer to sit on her exam committee, and other professors refused to take his place in February 2016.").)   Because Plaintiff complains of the continuation of the violations into the present (and not just the present consequences of a one-time violation), the continuing violation doctrine applies.  Plaintiff may not recover for the alleged retaliation that occurred outside the statute of limitations but may recover for "for any violations for which the statute of limitations has not expired."  *See Knight*, 19 F.3d at 581 ("Where a continuing violation is found, the plaintiff[] can recover for any violations for which the statute of limitations has not expired." (citing *Beavers v. Am. Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir. 1992))).

### 3.     Erroneous Outcome Claim (Count III)

Plaintiff's erroneous outcome claim seeks to hold Defendant liable for certain actions taken by faculty and administrators that "precipitated erroneous outcomes in Plaintiff's November 2014 Title IX complaints." (Dkt. 55 ¶ 140.)  Plaintiff cites several actions, such as the issuance of a results letter to Rice-Bey and an NCO against Plaintiff in December 2014, the denial of her requests for a disciplinary conference or hearing in April 2015, failure to consider new evidence that came to light after December 2014, and the denial of her requests for accommodations or protective measures from fall 2013 until spring 2020.  (*Id.* ¶¶ 43, 60, 140.) Most of these actions occurred more than two years before she filed her complaint, and Plaintiff had notice of these actions more than two years before she filed her complaint.  For the actions Plaintiff alleges continued into 2020, the continuing violation does not apply.  As with Count I, Plaintiff is merely complaining of the present consequences of a one-time violation.  *Knight*, 19 F.3d at 580–81.  In other words, her erroneous outcome allegations, such as the denial of her requests for accommodations until spring 2020, are present consequences of

Defendant's original denial of her Title IX complaint.   Plaintiff's erroneous outcome claim is time barred.

### 4.   Selective Enforcement Claims (Count IV)

Plaintiff asserts two selective enforcement claims against Defendant: one with Rice-Bey as the comparator and the other with Young as the comparator.  (Dkt. 55 ¶ 146.)  Specifically, Plaintiff asserts Defendant "clearly treated Rice-Bey and Young, both men, more favorably than Plaintiff, a woman, in disciplinary proceedings for Plaintiff's November 2014 complaints and the matters that resulted from those complaints, including Rice-Bey's August 2015 counterclaim and Young's March 2016 complaints."  (*Id.*)

With Rice-Bey as the comparator, Plaintiff claims, inter alia, that Defendant gave Rice-Bey—not Plaintiff—notice of the charges under consideration and the sanctions issued in December 2014 and "administrators were preparing to conduct a hearing for Rice-Bey's countercomplaint as early as April 2015" despite not affording Plaintiff a disciplinary conference or hearing.  (*Id.* ¶¶ 39, 42, 44, 147.)  Despite these allegations occurring outside the two-year limitations period, Plaintiff claims she did not know about them until later: Plaintiff alleges

Defendant officials hid Rice-Bey's countercomplaint from Plaintiff and she did not discover it until November 5, 2015 while reviewing her own education records. (*Id.* ¶¶ 71, 147(h).) Because the crux of the claim centers on Defendant treating Rice-Bey better in his countercomplaint than Defendant treated Plaintiff in her complaint, Plaintiff did not have notice of a legally cognizable claim against Defendant until at least November 2015 when she learned the countercomplaint existed. November 2015 is within two years of Plaintiff filing the complaint. Accordingly, Plaintiff's selective enforcement claim with Rice-Bey as the comparator is not time barred.

Plaintiff's selective enforcement claim relating to Young is also not time barred. In March 2016, Young filed a complaint against Plaintiff for defamation and furnishing false information to Defendant. (*Id.* ¶ 78.) No one notified Plaintiff of this complaint for two months. (*Id.* ¶ 148.) Plaintiff alleges Defendant offered Young a full hearing, the opportunity to present his case to a panel, and the option to appeal—none of which were given to Plaintiff for her Title IX complaint. (*Id.*) Plaintiff did not have a legally cognizable claim against Defendant for this alleged

conduct until May 2016 at the earliest, which is within the two-year statute of limitations.

### 5. Gender-based Hostile Environment Claim (Count V)

Plaintiff seeks to hold Defendant liable for her educational environment being pervasively and continually permeated with gender discrimination. (*Id.* ¶ 156.)  Plaintiff alleges Defendant's faculty, administrators, and officials engaged in gender discrimination and Defendant's policies and course schedule demonstrate a gender-based hostile environment. (*Id.*)  Some of her allegations occurred (and she was aware of them) more than two years before she filed suit. For example, Plaintiff alleges that, in March 2014, Defendant's President Carlton Brown publicly stated that he planned to reduce the number of female students by ten percent over the next five years. (*Id.* ¶ 136.)  In February 2015, Roman allegedly suggested "women invite sexual assaults by making 'bad decisions' to trust classmates." (*Id.* ¶¶ 136, 156(g).)  And on April 8, 2015, Young said "the Department would not accommodate

Plaintiff as a Title IX complainant." (*Id.* ¶¶ 52, 156(e).)  These allegations are time barred.

Plaintiff, however, alleges other expressions and practices of gender discrimination within the two-year limitations period.  As an example, Plaintiff alleges in the fall 2015 semester Defendant "revoked the charters of the female extensions of male student programs such as Lady BFly and the Women's Initiative Program." (*Id.* ¶¶ 135, 156(d).)  And on March 15, 2016, Clark and Taylor made gender-based derogatory comments about women, were deprecating and dismissive of Plaintiff, and warned Plaintiff to "[b]e careful" in response to her reports of sexual harassment.  (*Id.* ¶¶ 63–66, 156(a).)  Because Plaintiff complains of the continuation of violations into the present (and not just the present consequences of a one-time violation), the continuing violation doctrine applies.  Plaintiff may not base her gender-based hostile environment claim on conduct that occurred (and of which she was aware) before the two-year limitations period, but she may recover for "for any violations for which the statute of limitations has not expired." *See Knight*, 19 F.3d at 581 ("Where a continuing violation is found, the plaintiff[] can recover

for any violations for which the statute of limitations has not expired."
(citing *Beavers*, 975 F.2d at 796)).

The Court finds part of Count I and Count III are time barred.  As
to Count I, Plaintiff's student-on-student sexual harassment claim
pertaining to Rice-Bey is time barred, but the teacher-on-student sexual
harassment claim pertaining to the professors is not.  Counts II, IV, and
V are not time barred.

### B.   Sufficiency of the Pleadings

Defendant next argues the complaint fails to plead sufficient facts
to support Plaintiff's claims.  (Dkt. 58 at 12–22.)  Having found part of
Count I and Count III are time barred, the Court declines to analyze the
sufficiency of those portions of the complaint.

### 1.   Teacher-on-Student Sexual Harassment Claim (Count I)

Plaintiff seeks to hold Defendant liable for its alleged deliberate
indifference to Professors Ledgister, Boone, Young, and Gibrill sexually
harassing her.   (Dkt. 55 ¶ 99.)   Discrimination under Title IX
encompasses teacher-on-student sexual harassment.  *Sauls v. Pierce
Cnty. Sch. Dist.*, 399 F.3d 1279, 1283 (11th Cir. 2005) (citing *Franklin v.
Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74–76 (1992)).   For Title IX

liability to arise, a plaintiff alleging teacher-on-student sexual harassment must show (1) an "official with the authority to take corrective measures had actual notice of the harassment; and (2) the official with such notice was deliberately indifferent to the misconduct." *Id.* at 1284 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998)). Defendant does not address this claim in its motion to dismiss; indeed, Defendant focuses entirely on Plaintiff's student-on-student sexual harassment claim. (Dkt. 58 at 13–15.) Defendant, as the party moving for dismissal, has the burden of proving that no claim has been stated. *See, e.g.*, *DeKalb Cnty. Sch. Dist. v. J.W.M.*, 445 F. Supp. 2d 1371, 1374 (N.D. Ga. 2006) ("Under Fed. R. Civ. P. 12(b)(6), the party moving for dismissal for failure to state a claim upon which relief can be granted has the burden of proving that a claim has not been stated."). It is not the responsibility of the Court to parse through the complaint looking for a reason to grant a defendant's motion to dismiss. The Court thus denies Defendant's motion to dismiss as to Plaintiff's teacher-on-student sexual harassment claim.

## 2.  Retaliation Claim (Count II)

Plaintiff alleges Defendant retaliated against her by taking frequent and severe adverse actions in response to her Title IX-protected activities.  (Dkt. 55 ¶ 119.)  To state a claim for retaliation under Title IX, a plaintiff must show (1) she engaged in statutorily protected expression; (2) the defendant took action that would have been materially adverse to a reasonable applicant; and (3) a causal link existed between the two events.  *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 911 (11th Cir. 2013) (per curiam).[2]  Defendant's argument focuses entirely on the third element.  (Dkt. 58 at 16.)  "A causal link between protected expression and the materially adverse action arises where the defendant was aware of the protected expression and took materially adverse action as a result."  *Kocsis*, 788 F. App'x at 686 (citing *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).  This causal link "must be established according to traditional principles of but-for causation, which requires 'proof that the desire to retaliate was

---

[2] The Supreme Court has recognized a claim for retaliation under Title IX.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).  Title IX retaliation claims are analyzed under the framework for Title VII retaliation claims.  *Kocsis v. Fla. State Univ. Bd. of Trs.*, 788 F. App'x 680, 686 (11th Cir. 2019) (per curiam).

the but-for cause of the challenged action.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).  To demonstrate but-for causation at the motion to dismiss stage, a plaintiff must show (1) the decisionmakers knew of the protected conduct and (2) the protected conduct and the adverse actions were not wholly unrelated.[3]  *Bowers*, 509 F. App'x at 911.

Defendant argues Plaintiff pled no facts "either assert[ing] or demonstrat[ing] that a desire by [Defendant] to retaliate against Plaintiff was the but-for cause of the litany of 'adverse' actions she describes" in the complaint.  (Dkt. 58 at 16.)  The Court disagrees.  The complaint contains numerous allegations demonstrating that Defendant knew of her Title IX-protected activities.  (*See, e.g.*, Dkt. 55 ¶ 116.)  Similarly, the

---

[3] The parties seem to confuse causation, an element of the plaintiff's prima facie case, with pretext, which the plaintiff must demonstrate to rebut a non-discriminatory reason proffered by the defendant.  (Dkts. 58 at 16; 59 at 14.)  "To state a plausible retaliation claim, the plaintiff need only allege a plausible case of discrimination and need not allege facts demonstrating that the non-discriminatory reason proffered by the defendant was pretextual."  *Garrett v. Univ. of S. Fla. Bd. of Trs.*, 448 F. Supp. 3d 1286, 1307–08 (M.D. Fla. 2020), *aff'd* 824 F. App'x 959 (11th Cir. 2020).  In other words, the burden shifting analysis pertaining to pretext as set forth in *Kocsis*, 788 F. App'x at 686–87, only applies *after* a plaintiff establishes a prima facie case for retaliation.  *Garrett*, 824 F. App'x at 966.

complaint contains sufficient allegations to show that her Title-IX protected activities and the adverse actions were not wholly unrelated. As Plaintiff points out in her response, Plaintiff alleges in her complaint that Defendant officials *"explicitly stated*—sometimes even in writing— that they took adverse actions against Plaintiff *because* she engaged in Title IX-protected activities." (Dkt. 59 at 15.) As an example, on January 12, 2016, Ledgister allegedly told Plaintiff that she could not register for the spring 2016 semester unless she signed an agreement stating that she would attend the seminar and no longer pursue her Title IX complaints. (Dkt. 55 ¶ 77(e).) And Plaintiff alleges that, in 2016, Defendant held a formal hearing on the complaints filed by Young and Younge "to punish her for allegedly reporting sex discrimination." (*Id.* ¶ 119(f).) These allegations are more than sufficient to demonstrate the protected conduct and adverse actions were not wholly unrelated. Plaintiff has sufficiently pled her retaliation claim to survive Defendant's motion to dismiss.

### 3. Selective Enforcement Claim Relating to Rice-Bey (Count IV)

Plaintiff alleges Defendant treated Rice-Bey, a male, more favorably than Plaintiff, a female, in disciplinary proceedings for

Plaintiff's November 2014 complaints and Rice-Bey's August 2015 counterclaim. (*Id.* ¶ 146.) Citing *Whitaker v. Board of Regents of University System of Georgia*, No. CV 118-141, 2020 WL 4939118 (S.D. Ga. Aug. 24, 2020), Defendant argues this claim fails as a matter of law and should be dismissed because the Eleventh Circuit has not recognized a selective enforcement claim. (Dkt. 58 at 18.) The *Whitaker* court was right that the Eleventh Circuit has not yet expressly adopted a selective enforcement cause of action for university disciplinary proceedings. *Whitaker*, 2020 WL 4939118, at *3. But the Circuit has not expressly rejected it either, and several district courts in this Circuit have recognized such a claim. *See, e.g.*, *Doe v. Univ. of S. Ala.*, No. 17-0394, 2020 WL 759895, at *12 (S.D. Ala. Feb. 14, 2020); *Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205, 1211 (M.D. Fla. 2019); *Mancini v. Rollins Coll.*, No. 6:16-cv-2232-Orl-37KRS, 2017 WL 3088102, at *4 (M.D. Fla. July 20, 2017); *Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336, 1339 (S.D. Fla. 2017).[4] The Court thus declines to hold Plaintiff's selective enforcement claim fails as a matter of law.

---

[4] In *Doe v. Valencia College*, 903 F.3d 1220, 1236 n.13 (11th Cir. 2018), the Eleventh Circuit "ma[d]e no comment (and indulge[d] no assumption) about" a selective enforcement cause of action under Title IX.

To state a selective enforcement claim, a "[p]laintiff must allege sufficient facts to permit the plausible inference that a 'similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender.'" *Whitaker*, 2020 WL 4939118, at *3 (citing *Rollins Coll.*, 352 F. Supp. 3d at 1211). To show that her offered comparator, Rice-Bey, was similarly situated, Plaintiff claims they both were graduate students involved in the same Title IX matter. (Dkt. 55 ¶ 147.) Plaintiff alleges more than ten ways in which Defendant treated Rice-Bey more favorably than Plaintiff. (*Id.* ¶¶ 147(a)–(j), 148(a), (h).) And to show how the differential treatment was based on Plaintiff's gender, Plaintiff alleges Defendant's treatment of Plaintiff in Rice-Bey's counterclaim "clearly evidenced gender bias" because Rice-Bey told Defendant officials that "the purpose of his complaint was to continue preventing Plaintiff from escaping the hostile environment his sexual harassment imposed on her education" and Defendant ratified Rice-Bey's actions and underlying gender animus when it knowingly enabled Rice-Bey to use the disciplinary process for an improper purpose. (*Id.* ¶¶ 149–50.) At the motion to dismiss stage, the Court finds Plaintiff's allegations plausibly make out a selective enforcement claim—with

Rice-Bey as the comparator—against Defendant. The Court denies Defendant's motion to dismiss as to this claim.

### 4. Selective Enforcement Claim Relating to Young (Count IV)

Plaintiff alleges Defendant treated Young, a male, more favorably than Plaintiff, a female, in disciplinary proceedings for Plaintiff's November 2014 complaints and Young's March 2016 complaint. (*Id.* ¶ 146.) To show that her offered comparator, Young, was similarly situated, Plaintiff claims "they were parties to the same matter and subject to the same disciplinary policies." (*Id.* ¶ 148.) Plaintiff alleges eight ways in which Defendant treated Young more favorably than Plaintiff. (*Id.*) And to show how the differential treatment was based on Plaintiff's gender, Plaintiff alleges Defendant's treatment of Plaintiff in Young's complaint "clearly evidenced gender bias" because Young told Defendant officials "he sought to punish Plaintiff for reporting him for sexually harassing Younge" and Defendant ratified Young's actions and underlying gender animus when it knowingly enabled Young to use the disciplinary process for an improper purpose. (*Id.* ¶¶ 149–50.) At the motion to dismiss stage, the Court finds Plaintiff's allegations plausibly make out a selective enforcement claim—with Young as the

comparator—against Defendant.  The Court denies Defendant's motion to dismiss as to this claim.

###   5.   Gender-based Hostile Environment Claim (Count V)

Plaintiff alleges that, "[i]n addition to the sexual harassment that Plaintiff experienced from Rice-Bey and Department professors, [her] educational environment was pervasively and continually permeated with other expressions and practices of gender discrimination against women that altered the conditions of her education and employment." (*Id.* ¶ 156.)  Citing *Does 1, 2, 3, 4 v. Covington County School Board*, 969 F. Supp. 1264 (M.D. Ala. 1997), Defendant argues "hostile environment claims arise as an extension of sexual harassment claims."  (Dkt. 58 at 19.)  The Court agrees.  As the Court explained in its March 18, 2020 Order, every sexually hostile environment case the Court has read in the Eleventh Circuit involved a plaintiff complaining of a sexually hostile environment created by student-on-student sexual harassment or teacher-on-student sexual harassment.[5]  (Dkt. 25 at 13–14.)  Moreover,

---

[5] *See, e.g.*, *Does*, 969 F. Supp. 1264 (analyzing hostile environment claims based on both student-on-student and teacher-on-student sexual harassment); *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1332,

courts often analogize Title IX claims to Title VII claims, and hostile environment claims under Title VII require harassment for a viable claim.[6]  The problem with Plaintiff's hostile environment claim is that the complaint, which the Court takes as true for purposes of resolving the motion to dismiss, provides that her hostile environment claim "do[es] not arise from sexual harassment."[7]  (Dkt. 55 ¶ 155.)  Absent some connection to harassment, the Court finds that "gender-based hostile environment" is not a viable cause of action under Title IX.  *See S.B. v. Fla. Agric. & Mech. Univ. Bd. of Trs.*, No. 4:16cv613, 2019 WL 11254780,

---

1345 (M.D. Ga. 2007) (interpreting "a general violation of Title IX of the Education Act and *Hostile Environment* Based on Sex" for the school's failure to adequately respond to a student's sexual assault complaint as a Title IX student-on-student harassment claim (emphasis added)).

[6] To establish a prima facie case of a hostile work environment under Title VII, a plaintiff must show: (1) she is a member of a protected class; (2) unwelcome *harassment* occurred; (3) the *harassment* was based on Plaintiff's gender; (4) the *harassment* was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer knew or should have known of the *harassment* and failed to take remedial action.  *Blalock v. Dale Cnty. Bd. of Educ.*, 84 F. Supp. 2d 1291, 1303 (M.D. Ala. 1999) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)).

[7] Even if her hostile environment claim arose from sexual harassment, it would have to be based on the professors' alleged sexual harassment because her student-on-student sexual harassment allegations are time barred as explained above.

at *19–20 (N.D. Fla. Mar. 1, 2019) (finding that a "hostile educational environment" is not a viable cause of action under Title IX).  The Court grants Defendant's motion to dismiss as to this claim.

### 6.   Breach of Contract (Count VI)

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *SAWS at Seven Hills, LLC v. Forestar Realty, Inc.*, 805 S.E.2d 270, 274 (Ga. Ct. App. 2017) (citing *Dewrell Sacks, LLP v. Ch. Title Ins. Co.*, 749 S.E.2d 802, 806 (Ga. Ct. App. 2013)).  Plaintiff alleges Defendant breached its contract with Plaintiff by failing to comply with its own policies and the Clery Act. (Dkt. 55 at 74–88.)  Defendant argues that, "[t]o the extent Plaintiff's breach of contract claim attempts to assert[] a cause of action under the Clery Act, it is barred as a matter of law."  (Dkt. 58 at 20.)  As the Court explained in its March 18, 2020 Order, the Clery Act does not create a private cause of action against any college, university, or employee.  (Dkt. 25 at 18); 20 U.S.C. § 1092(f)(14)(A) ("Nothing in this subsection may be construed to (i) create a cause of action against any institution of higher education or any employee of such an institution for any civil liability; or

(ii) establish any standard of care."); Brett A. Sokolow, et al., *College and University Liability for Violent Campus Attacks*, 34 J.C. & U.L. 319, 344 (2008) ("The enforcing authority for Clery Act violations is the U.S. Department of Education.").

Plaintiff cannot circumvent the lack of a Clery Act private right of action by recharacterizing the cause of action as a state law breach of contract claim. Accordingly, Plaintiff may not assert the contractual terms incorporated from the Clery Act. But Plaintiff's breach of contract claim does not fail because it also rests on allegations wholly unrelated to the Clery Act. The complaint pleads twenty-three instances in which Defendant allegedly violated its code of conduct. (Dkt. 55 at 77–80.) These allegations give rise to a plausible breach of contract claim. Plaintiff has identified specific provisions of the Student Handbook that Defendant purportedly breached and facts alleging how the breach occurred. (*Id.* ¶ 168.) That is sufficient at the motion to dismiss stage.

Defendant alternatively argues Plaintiff's breach of contract claim fails because she did not plead facts showing she was damaged by Defendant's actions. (Dkt. 58 at 21.) The Court disagrees. Plaintiff pled she suffered economic harm as a direct result of Defendant's breach.

(Dkt. 55 ¶ 182.)  She identifies her economic damages as "loss of at least three years' wages due to her delayed graduation and additional tuition, fees, rent, and other expenses"; loss of access to education programs, activities, and benefits; loss of career and business opportunities; loss of reputation; delay beginning her career; and loss of past, present, and future earnings and earning capacity.  (*Id.* ¶¶ 181, 183.)  The Court finds she pled damages sufficiently to survive the motion to dismiss stage.  *See, e.g.*, *TechBios, Inc. v. Champagne*, 688 S.E.2d 378, 381 (Ga. Ct. App. 2009) (finding an allegation that the plaintiff suffered damages in the form of lost profits and lost business opportunities sufficient to set forth a claim for breach of contract).  The Court denies Defendant's motion to dismiss as to this claim.

### 7.   Breach of the Implied Covenant of Good Faith and Fair Dealing (Count VII)

In Georgia, "[e]very contract implies a covenant of good faith and fair dealing in the contract's performance and enforcement."  *Secured Realty Inv. v. Bank of N. Ga.*, 725 S.E.2d 336, 339 (Ga. Ct. App. 2012).  The duty requires both parties to a contract to perform their promises and provide cooperation as is required for the other party's performance.

> The implied covenant modifies and becomes a part of the
> provisions of the contract, but the covenant cannot be
> breached apart from the contract provisions it modifies and
> therefore cannot provide an independent basis for liability.
> Therefore, to prevail on [her] claim for breach of the duty of
> good faith and fair dealing, [Plaintiff] must establish that
> [Defendant] owed a contractual obligation.

*Id.* In Count VII, Plaintiff alleges Defendant repeatedly breached the

implied covenant of good faith and fair dealing between fall 2013 and

spring 2020 by refusing to comply with its policies or provide Plaintiff

with fair investigatory and adjudicatory processes. (Dkt. 55 ¶ 185.) To

support her claim, Plaintiff cites three cases: *Sirpal v. University of*

*Miami*, 509 F. App'x 924 (11th Cir. 2013), *Doe v. Rollins College*, 352 F.

Supp. 3d 1205 (M.D. Fla. 2019), and *Doe v. Lynn University, Inc.*, 235 F.

Supp. 3d 1336 (S.D. Fla. 2017). (Dkt. 55 ¶ 184.) These cases, however,

are irrelevant to a Georgia breach of the implied covenant of good faith

and fair dealing claim. In *Sirpal*, the court analyzed a breach of contract

claim at the summary judgment stage and applied Florida law. 509 F.

App'x at 929. In *Rollins College*, the court permitted the plaintiff's breach

of the implied covenant of good faith and fair dealing claim to proceed,

but it cited to and applied Florida law. 352 F. Supp. 3d at 1212. And in

*Lynn University*, the court likewise permitted the plaintiff's breach of the

implied covenant of good faith and fair dealing claim to proceed, but it rested its conclusion on an Eleventh Circuit case that interpreted Florida law.  235 F. Supp. 3d at 1343 (citing *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1329 (11th Cir. 2012)).

Besides these cases, this count in the complaint contains one brief and conclusory paragraph in which Plaintiff alleges Defendant breached the implied covenant of good faith and fair dealing as "established in Counts I–VI." (Dkt. 55 ¶ 185.)  The Court previously instructed Plaintiff to "identify by reference the specific factual allegations and acts by Defendant that support each cause of action" and to "explain the specific factual assertions that support each of her claims for relief."  (Dkt. 25 at 3–4.)  With respect to Count VII, Plaintiff ignored this guidance entirely. By incorporating all the previous allegations, Plaintiff obscures what allegations are important for this claim.  The complaint is 187 paragraphs and 92 pages in length; the Court cannot undertake the task of sifting through the complaint to find allegations that support Plaintiff's claim that Defendant breached the implied covenant of good faith and fair dealing.  The Court grants Defendant's motion to dismiss as to this claim.

### C.   Shotgun Pleading

Defendant argues in the alternative that Plaintiff's complaint should be dismissed as an impermissible shotgun pleading.  (Dkt. 58 at 23.)  The Court agrees with Defendant that Plaintiff's complaint "mak[es] it difficult to distill the subject of her claims." (*Id.* at 23–24.)  In its March 18, 2020 Order, the Court urged Plaintiff to be more precise in her briefing and instructed her to "(1) limit the length of the complaint, (2) identify by reference the specific factual allegations and acts by Defendant that support each cause of action, and (3) explain the specific factual assertions that support each of her claims for relief."  (Dkt. 25 at 3–4.)  While Plaintiff shortened the complaint from 227 pages to 92 pages, other issues remain.  (Dkts. 1; 55.)  The complaint contains 36 pages of "general allegations" that are incorporated into each count, obscuring what may be important contentions.  (Dkt. 55 at 1–36; ¶ 93.)  And large swaths of the complaint are improper irrespective of their relevance, consisting of legal arguments and case citations.  The Court has waded through all of this excessive, irrelevant, and improper verbiage to resolve this motion.  But it will not do so again.  Should Plaintiff seek leave to

amend her complaint, she must comply with Rule 8, or the Court will not hesitate to impose sanctions.[8]

## D.   Leave to Amend the Complaint

"[A]nticipat[ing] that Plaintiff will seek leave to file a second amended complaint," Defendant argues the Court should deny Plaintiff the opportunity to amend her complaint because amendment would be futile. (Dkt. 58 at 24.) Plaintiff does not explicitly request leave to amend her complaint, but to the extent she wishes to do so, the Court denies her request. (Dkt. 59 at 25.) The proper method for requesting leave to amend a complaint is by filing a motion. *See Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) ("Filing a motion is the proper method to request leave to amend a complaint. . . . A motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment."); *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) ("A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend

---

[8] *See* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief").

nor requested leave to amend before the district court.").  Plaintiff did not file a motion either explaining the substance of the proposed amendment or attaching a copy of the proposed amendment, nor did Plaintiff affirmatively ask to amend her complaint.  Should Plaintiff wish to amend her complaint, she may file a motion.

## IV.   Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss (Dkt. 58).  The Court **DISMISSES** part of Count I[9] and Count III as time barred and Counts V and VII for failure to state a claim.  The other part of Count I as well as Counts II, IV, and VI may proceed.  The Court **DENIES AS MOOT** Plaintiff's Motion for Oral Argument (Dkt. 63).

**SO ORDERED** this 23rd day of February, 2021.



MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

---

[9] To be clear, Plaintiff's student-on-student sexual harassment claim pertaining to Rice-Bey is time barred, but her teacher-on-student sexual harassment claim is not.